NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

RAYMOND J. DONOVAN,

*Plaintiff*,

v.

DRAGADOS, S.A., DRAGADOS
INVERSIONES USA, S.L., and NEWARK
REAL ESTATE HOLDINGS, INC.,

*Defendants*.

Civil Action No. 09-409 (KSH) (CW)

**OPINION**

**Katharine S. Hayden, U.S.D.J.**

I.   INTRODUCTION ......................................................................................... 1
II.  JURISDICTION ............................................................................................ 3
III. FACTS ........................................................................................................... 3
   A. The SPA ................................................................................................... 4
   B. SCC's M/W/DBE Procurement Objectives and Obligations ..................... 10
   C. 2004 Investigation ................................................................................... 12
   D. 2007 Investigation ................................................................................... 13
   E. 2008 Search Warrants & Grand Jury Subpoenas ...................................... 16
   F. M/W/DBE Compliance Audit .................................................................. 17
      1. Job 506 Audit Results ....................................................................... 19
      2. Job 510 Audit Results ....................................................................... 21
      3. Job 511 Audit Results ....................................................................... 23
   G. Non-Prosecution Agreement .................................................................... 23
   H. Payments Made to Donovan under the SPA .............................................. 27
IV. DISCUSSION & ANALYSIS ....................................................................... 28
   A. Breach of Contract .................................................................................. 28
   B. Dragados Alleges Donovan Breached the SPA .......................................... 29
      1. SPA Sections 4.8(a) & 4.9(c) – Failure to Disclose Material Facts ......... 30
      2. SPA Section 4.9(a) – Submitting Inaccurate M/W/DBE Reports in Violation of the
         Law and Maintaining Inaccurate Books & Records ............................... 34
   C. Dragados Alleges it is Entitled to Indemnification from Donovan for Damages
      Incurred in Connection with the Government's Criminal Investigation ................. 39
      1. Indemnification Under the SPA .......................................................... 39
      2. Reasonableness of Settlement ............................................................ 44
V.  CONCLUSION ............................................................................................. 46

## I.  INTRODUCTION

Schiavone Construction Company ("SCC") builds, among other large projects, bridges and tunnels for public entities like New York City, New York State, and the New Jersey Department of Transportation.  For years, it was owned by long time partners Ronald A. Schiavone ("Schiavone") and Raymond J. Donovan ("Donovan").  In December 2007, the partners sold SCC to a Spanish construction conglomerate made up of Dragados, S.A., Dragados Inversiones USA, S.L., and Newark Real Estate Holdings, Inc. (collectively "Dragados") for $150,000,000.  SCC continued (and continues still) to operate and to maintain its offices in Secaucus, New Jersey.

In February 2008, less than two months after Schiavone and Donovan transferred all their stock to Dragados under a detailed Stock Purchase Agreement ("SPA"), federal agents raided SCC's corporate office. Over the next months Dragados responded to requests for production of documents, provided witnesses for government interviews, and ultimately, in December, 2010, entered into an agreement with the U.S. Attorney for the Eastern District of New York whereby the company would not be criminally prosecuted.  The federal investigation related to certain SCC hiring practices that were in effect prior to the sale to Dragados.

Under the SPA, when Schiavone and Donovan fully divested themselves of their equal shares of SCC stock in December 2007, Dragados paid each of them $65,000,000, and owed each a final installment payment of $10,000,000 payable one year after the closing.  After the raid, and on written notice to Schiavone and Donovan, Dragados did not make the installment payments.  Nor did they remit, when they received it, tax refunds of over $800,000 owed under the SPA in equal shares to Schiavone and Donovan.

On January 29, 2009, Donovan filed this lawsuit for breach of contract and indemnification against Dragados. [*See* D.E. 19-4.] That same day, Schiavone sued Dragados under a virtually identical complaint. [D.E. 1.] On March 27, 2009, Dragados filed an answer and counterclaim in each of the actions alleging that Donovan and Schiavone materially breached representations and warranties in the SPA. [*See* D.E. 14.] On April 21, 2009, then-Magistrate Judge Patty Shwartz granted Dragados's uncontested motion to consolidate *Donovan v. Dragados, S.A., et al,* Civil Action No. 09-411 (SRC-MAS) and *Schiavone v. Dragados, S.A., et al.,* Civil Action No. 09-409 (KHS-PS). [D.E. 21.]

Discovery went forward, and the parties engaged in dispositive motion practice and brought in limine motions preparatory to a bench trial.[1] On the first trial day, Schiavone and Dragados stipulated to the dismissal of all pending claims in consideration for an undisclosed settlement they had consummated the week before. [D.E. 239.] The bench trial between Donovan and Dragados went forward on January 29—31, 2013, February 1, 2013, and February 7, 2013. [D.E. 235, 240-242, 244.] Donovan testified on his own behalf and called Greg Vasel as a rebuttal witness. [D.E. 235; D.E. 244.] Testifying on behalf of Dragados were Paul Scagnelli, Melanie Swalm, Frederick Bunker, Lorraine D'Angelo, Mary Libassi (all SCC employees, some of whom stayed on with Dragados after the sale), and Jose Antonio Lopez (the President of Dragados). [D.E. 235, 240-244.][2] The parties subsequently filed post-trial written summations. [D.E. 245, 246.]

---

[1] Under Section 12.7 of the SPA, the parties waived a jury trial.

[2] By letter dated January 25, 2013, counsel for Dragados notified the Court that it learned Carl Cosenzo, a former high-ranking official at SCC who was subpoenaed to appear at trial, intended to assert his Fifth Amendment right against self-incrimination when questioned at trial. [D.E. 228.] Dragados argued that Cosenzo waived his Fifth Amendment rights by "testifying on the same topics" several times "under oath." [*Id.* at 1-3.] In the alternative, Dragados sought an adverse inference against Donovan. [*Id.* at 1, 4] In response, Donovan opposed the drawing of

Having heard the testimony of the witnesses, reviewed the exhibits, and considered the parties' summation briefs, the Court, in accordance with Fed. R. Civ. P. 52(a), makes factual findings and conclusions of law that are set forth below.

## II.  JURISDICTION

Jurisdiction arises in this Court pursuant to 28 U.S.C. § 1332(a) in that the amount in controversy exceeds $75,000 exclusive of interest and costs and the matter is between citizens of different States.

## III.  FACTS

The core of this dispute is the very different way the parties apply the language of the SPA to the undisputed series of events that began in February 2008 with the raid by federal authorities and finally concluded in December 2010 with the consummation of Dragados's non-prosecution agreement that included, among other things, payments to the Department of the Treasury, New York City Department of Investigation, and the MTA of approximately $22,370,000 in fines and investigative costs. [Defs.' Exhs. 398, 403, 405, 407, 408.] Donovan reads the SPA to require Dragados to make the final $10,000,000 payment to him, remit one-half of the tax refunds, and pay him reasonable fees and costs expended in enforcing his rights under the SPA, notwithstanding the financial impact on Dragados of the federal investigation. Dragados reads the same SPA to require that Donovan reimburse it for the fines and

---

an adverse inference and argued that if Cosenzo's invocation of privilege were sustained he would seek to admit Cosenzo's deposition testimony as evidence at trial. [D.E. 230.] Counsel for Cosenzo, Avi Moskowitz, proffered to the Court – in a letter submission and *in camera* at trial – a good faith basis for believing that Cosenzo's trial testimony may be incriminating.  [D.E. 238.] As such, the Court was satisfied with counsel's good faith basis for Cosenzo's invocation of the privilege, rejected Dragados's request for an adverse inference, and ruled that such unavailability rendered Cosenzo's prior deposition testimony admissible.  [Tr. Day 1, 79:23-80:12; 81:14-24.] The Court requested that the parties collaborate regarding a joint redaction of the transcript that would represent a fair excerpt of the deposition testimony.  [*Id.* 81:14-24.] The parties admitted a redacted version of Cosenzo's April 12, 2010 deposition transcript as Joint Exhibit 1 ("JE 1").

investigative costs it paid to federal and state agencies, as well as the legal fees Dragados incurred over the years it negotiated and ultimately settled with the government and the legal fees it has incurred in this litigation.  In short, each side to this lawsuit believes the other owes him/it millions of dollars in damages based on these competing interpretations of the SPA.

Except where specifically noted, the facts set forth in this section are not in dispute and may be deemed the Court's findings.

### A.  **The SPA**

SCC is a "heavy construction company" that specializes in transportation projects including, but not limited to, building bridges, tunnels, and storage treatment plants.  [Tr. Day 1, Donovan 59:10-15.]  This work is performed almost exclusively for public owners such as the New Jersey Department of Transportation ("DOT"), the New York Metropolitan Transit Authority ("MTA"), and the New York City Department of Environmental Protection ("DEP"). [Tr. Day 1, Scagnelli 84:20-85:3.]

On December 27, 2007, represented by counsel and after negotiations, Donovan and Schiavone entered into the SPA, under which they transferred their respective 50% shares of the stock in SCC to Dragados in exchange for $75,000,000 each ($150,000,000 total).  [Pl.'s Exh. 1, Defs.' Exh. 134 (hereinafter "SPA") § 2.2 ("The Purchase Price"); Tr. Day 1, Donovan 59:22-60:12, 61:18-21.]  In accordance with Section 2.2 of the SPA, Dragados was to pay each partner in two installments: $65,000,000 within 30 days of closing and $10,000,000 plus 7% annual interest one year after closing (the "Installment Payment").  [SPA § 2.2; Tr. Day 1, Donovan 62:9-18.]  Section 11.5 of the SPA further required that Dragados remit to Donovan and Schiavone, in equal shares and when received, all tax refunds or credits due to SCC for the pre-closing date period of 2007.  [SPA § 11.5(a); Tr. Day 1, Donovan 62:19-23, 63:4-7.]  In Section

12.17(a), Dragados "unconditionally guarantee[d]" its "full and punctual payment, performance and observance, as and when due, of all of the terms, covenants, conditions and obligations in this Agreement" including "payment of the Purchase Price and the Installment Payment." [SPA § 12.17(a).]

Donovan and Schiavone both made material representations and warranties in Articles IV and V of the agreement and Dragados made material representations and warranties in Article VI. [*See generally* SPA Arts. IV, V, and VI.] Donovan and Schiavone's representations and warranties were "made on the basis of SCC's Knowledge," which is defined in the SPA as "the actual Knowledge of any of the Persons set forth in Exhibit B with respect to SCC." [SPA Preamble to Article IV and § 1.1.] Exhibit B of the SPA identifies the following as Persons with Knowledge: (1) Raymond J. Donovan; (2) Ronald A. Schiavone; (3) Gregory M. Vasel; (4) Mary Libassi; (5) Mike Goldstein; (6) Carl Cosenzo; (7) Jim Hamill; (8) Paul Scagnelli; and (9) Frederick Bunker. [SPA Exh. B.] In short, the representations and warranties made in Articles IV and V were based on the actual knowledge of the people enumerated in Exhibit B of the SPA.

Relevant to the issues presented at trial, Donovan and Schiavone made the following representation/warranty:

> **Section 4.8  Litigation.**
>
> **(a)**    SCC has furnished to Parent[3] a complete list of each litigation, suit, action, claim, filed charge, arbitration, complaint or other proceeding (each, an "Action") that has been instituted or, to the Knowledge of SCC, threatened against, by or affecting SCC, any of its Subsidiaries, PPR[4] or the Shareholders (solely in relation to SCC, its Subsidiaries or PPR), the

---

[3] "Parent" is defined in the introduction of the SPA as Dragados. [SPA, p.1.]

[4] "PPR" refers to 1600 P.P.R., Inc., a New Jersey Corporation that Schiavone and Donovan sold under the SPA. [SPA § 2.1.]

outcome of which, if determined adversely to SCC, PPR or the Shareholders, would be reasonably expected to have a Material Adverse Effect. Except as set forth in Section 4.8(a) of the Disclosure Letter, (i) there is no Action by or before any Governmental Authority pending or, to the Knowledge of SCC, threatened, against, by or affecting SCC, any of its Subsidiaries, PPR or the Shareholders (solely in relation to SCC, its Subsidiaries or PPR), except for such Actions as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect on SCC, and (ii) no material investigation or inquiry by or before any Governmental Authority is pending or, to the Knowledge of SCC, threatened against SCC, any of its Subsidiaries, PPR or the Shareholders (solely in relation to SCC, its Subsidiaries or PPR).

[SPA § 4.8(a).] The Disclosure Letter mentioned in Section 4.8 is a document appended to the SPA dated December 14, 2007, which contains "disclosures" that correspond to the various sections in the SPA. Of significance here, Donovan and Schiavone made the following disclosure regarding SPA § 4.8(a) ("Material Litigation/*Pending or threatened against SCC*" (italics in original)):

**5.** <u>MTA Office of Inspector General</u>: On December 2, 2004, the Schiavone/Granite Halmar Joint Venture received a subpoena from the Metropolitan Transportation Authority, Office of the Inspector General, for records related to three (3) Disadvantaged Business Enterprise subcontractors (O.J. Painting, New York Stone and Dan Yant, Inc.) performing work on the Times Square project. Records responsive to the subpoena were produced. On February 24, 2005, additional documents were requested with respect to Dan Yant, Inc. On November 9, 2006, an officer and project manager of SCC and one individual employed by Granite Halmar were subpoenaed by the MTA in a "confidential investigation." The witnesses appeared at the hearings and gave testimony;

questions were limited to Dan Yant, Inc. To date, SCC has not received any further information regarding the investigation.

[Plf.'s Exh. 2; Defs.' Exh. 135 (hereinafter "Disclosure Letter") at § 4.8(a).]

Donovan and Schiavone represented to Dragados in Section 4.9(a) of the SPA that "SCC, each of its Subsidiaries, PPR and the Shareholders . . . are, and have been at all times, in compliance in all material respects with all applicable Laws. All Books and Records, including personnel files of any employee, of SCC and its Subsidiaries have been maintained, in all material respects, accurately and in accordance with applicable Law." [SPA § 4.9(a).] "Books and Records" are defined in Section 1.1 of the SPA as "all customer lists, policy information, insurance contract forms, administrative and pricing manuals, claim records, sales records, underwriting records, financial records, compliance records, data files and other materials prepared for or filed with Government Authorities regulating the businesses of SCC and its Subsidiaries, Tax records and other books and records . . ." [*Id.* § 1.1.] "Law" is defined as: "any law (including common law), ordinance, writ, directive, judgment, order, decree, injunction, statute, treaty, rule, regulation, regulatory requirement or determination of a Governmental Authority." [*Id.*]

Donovan and Schiavone represented to Dragados in Section 4.9(c) of the SPA, that:

(c) Except as set forth in Section 4.9(c) of the Disclosure Letter (i) none of SCC, any of its Subsidiaries, PPR or the Shareholders has received any written notice from any Governmental Authority that, or otherwise has any Knowledge that, (x) alleges any material noncompliance (or that SCC or any of its Subsidiaries is under investigation or the subject of an inquiry by any such Governmental Authority for such alleged noncompliance) with any applicable Law or (y) could reasonably be expected to result in a material fine, assessment or cease and desist order, or the suspension, revocation or limitation or

restriction of any SCC Permit, and (ii) except for the payment of fines and penalties incurred in the ordinary course for infractions that are not material in nature or amount and for routine and customary corrective measures undertaken at Projects in response to site inspections in the ordinary course, none of SCC, any of its Subsidiaries, PPR or the Shareholders (solely in relation to SCC, its Subsidiaries or PPR) has entered into any agreement or settlement with any Governmental Authority with respect to its non-compliance with, or violation of, any applicable Law.

[*Id.* § 4.9(c).] The only disclosures in related Section 4.9(c) of the Disclosure Letter pertain to small fines incurred in the ordinary course of business, a notice related to an alleged discharge of a pollutant, and two violations stemming from a groundwater discharge. [Disclosure Letter at § 4.9(c).]

In the event of a breach, Section 10.1 articulates Donovan and Schiavone's indemnification obligations while Section 10.2 articulates Dragados's indemnification obligations. [SPA §§ 10.1, 10.2.] All parties to the SPA agreed that "[e]xcept in the case of fraud or willful misrepresentation . . . the indemnification provisions of [ ] Article X and Article XI[5] shall be the exclusive monetary remedy of the Indemnified Persons with respect to breaches of representations, warranties, covenants, obligations or other provisions of this Agreement." [*Id.* § 10.8.]

Section 10.1(a) provides that Donovan and Schiavone must: "severally and not jointly, indemnify, defend and hold harmless Parent [Dragados], each of its Subsidiaries (including SCC and its Subsidiaries), and each of their respective directors, officers, managers and employees

---

[5] Section 11.8 provides that "[n]otwithstanding any other provision of this Agreement, this Article XI shall exclusively govern all matters related to indemnification for Taxes under this Agreement and Article X shall not apply to such matters."

(and the respective heirs, successors and assigns of each of the foregoing) (the "Parent Indemnified Persons") from and against and in respect of one hundred percent (100%) of all Parent Losses." [*Id.* § 10.1(a).] "Parent Losses" are further defined in the SPA as:

> all actual losses, liabilities, damages, judgments, settlements and expenses (including interest and penalties recovered by a Third Party with respect thereto and reasonable attorneys' fees and expenses and reasonable accountants' fees and expenses incurred in the defense of any of the same or in asserting, preserving or enforcing any of the rights of the Parent Indemnified Persons arising under Articles X and XI) incurred by any of the Parent Indemnified Persons, whether or not involving a Third-Party claim, which are caused by, arise from or are related to: (i) any breach by [Donovan],[6] Schiavone or SCC of any of their respective representations and warranties contained in or made by or pursuant to Article IV . . .

[*Id.* § 1.1.] In accordance with Section 10.1(b), Donovan and Schiavone must also:

> . . . severally and jointly, indemnify, defend and hold harmless the Parent Indemnified Persons from and against and in respect of one hundred percent (100%) of all actual losses, liabilities, damages, settlements and expenses (including interest and penalties recovered by a Third Party with respect thereto and reasonable attorneys' fees and expenses and reasonable accountants' fees and expenses incurred in the defense of any of the same or in asserting, preserving or enforcing any of the rights of the Parent Indemnified Persons arising under Article X) incurred by any of the Parent Indemnified Persons, whether or not involving a Third-Party claim, which are caused by, arise from or are related to (i) any breach of any representation or warranty made by SCC, [Donovan] or Schiavone pursuant to Article IV or Article V, (ii) any covenant of [Donovan] or Schiavone contained in this Agreement . . . ; provided, however, that, in

---

[6] "Donovan" is bracketed because the SPA says "such Shareholder" and Exhibit A to the SPA notes that Donovan and Schiavone are 50/50 Shareholders. [SPA, Exh. A ("Shareholder Data").]

the case of any representation or warranty that is limited by "material," "Material Adverse Effect" or by any similar term or limitation, the occurrence of a breach or inaccuracy of such representation or warranty . . . and the amount of losses subject to indemnification hereunder shall be determined as if "material," "Material Adverse Effect" or by any similar term or limitation were not included therein.

[SPA § 10.1(b) (underlining in original).]

With respect to Dragados's obligation to indemnify Donovan and Schiavone, Section 10.2(a) provides that Dragados must:

. . . indemnify, defend and hold harmless the Shareholders and each of their respective heirs, successors and assigns (the "Shareholder Indemnified Persons") from and against and in respect of one hundred percent (100%) of all actual losses, liabilities, damages, judgments, settlements and expenses (including interest and penalties recovered by a Third Party with respect thereto and reasonable attorneys' fees and expenses and reasonable accountants' fees and expenses incurred in the defense of any of the same or in asserting, preserving or enforcing any of the rights of the Shareholder Indemnified Persons arising under Article X) incurred by any of the Shareholder Indemnified Persons, whether or not involving a Third-Party claim, which are caused by, arise from or are related to (i) any breach of any representation or warranty made by Parent, Buyer or Newark Holdings pursuant to Article VI or in any certificate delivered by Parent or Buyer at Closing pursuant to Section 3.3, (ii) any covenant of Parent, Buyer or Newark Holdings contained in this Agreement . . . ("Shareholder Losses").

[SPA § 10.2(a).]

### B.  SCC's  M/W/DBE Procurement Objectives and Obligations

Jobs being performed by SCC for the MTA and DEP are subject to Minority, Woman, and Disadvantaged Business Enterprise requirements (known variously as MBEs, WBEs, and

DBEs, or collectively, M/W/DBEs). These programs were implemented to "benefit[ ] minorities and woman and disadvantaged business enterprises by allowing them to get work under the contracts" with companies such as SCC. [Tr. Day 5, Libassi 87:14-21.]

SCC is required to use M/W/DBEs on its public works contracts with the federal and state government. [Tr. Day 3, D'Angelo 53:14-21; Tr. Day 5, Libassi 87:14-21.] Indeed, the government provides funds to the relevant agency (MTA or DEP) in exchange for its compliance with the M/W/DBE requirements, which then flow down to the contractor (SCC). [Tr. Day 5, Libassi 88:23-89:18.] Thus, if there is miscounting of participation, the value of that miscounting is forfeited back up the chain. [*Id.*] The M/W/DBE programs are mandated by the owner of the project, *i.e.* the MTA or the DEP, which stipulates what the M/W/DBE participation goal will be on a particular project. [Tr. Day 1, Scagnelli 87:25-88:2; Tr. Day 2, Bunker 76:11-25.] Using a list of certified M/W/DBEs, prepared and provided by the owner or government agency contracting out the particular project, SCC solicits bids from M/W/DBE subcontractors to be included in its bid on the overall contract. [Joint Exh. 1, Deposition of Carl Cosenzo ("Cosenzo Dep.") 10:19-11:13.] Every M/W/DBE subcontractor must serve a commercially useful function, which means that the subcontractor must be able to perform the work on its own. [Tr. Day 2, Bunker 136:8-23; Tr. Day 3, D'Angelo 56:21-22.]

As a prerequisite for getting the contract, SCC must submit utilization plans identifying which certified M/W/DBE subcontractors it intends to employ – the owner ultimately uses this information to determine whether to award the contract to SCC. [Tr. Day 5, Libassi 88:2-8; Tr. Day 1, Scagnelli 88:2-7.][7] In addition to the initial plans, and in conjunction with the M/W/DBE

---

[7] If SCC's bid did not achieve the M/W/DBE participation goal set by the owner but the owner still decided to award the job to SCC, "which [did] happen," SCC had "an obligation to continue

participation goals, SCC is required to complete periodic progress reports related to the M/W/DBEs that are working on the project to be submitted to the respective owner (MTA/DEP). [Tr. Day 1, Scagnelli 88:8-18.]  These reports include information such as: the name of the subcontractor, a description of work the subcontractor was performing, and the subcontractor's start date; the projected completion date; the total subcontractor contract amount; the percentage of work completed; and total payments made to each subcontractor to date.  [Tr. Day 2, Bunker 77:20-78:14; *see, e.g.,* Defs.' Exh. 83 (Feb. 2007 Monthly Contractor DBE Progress Report for Job 510).]

The target of the federal agents' search and seizure of records and computers in February 2008 was information about SCC's use of certain M/W/DBEs on specific projects, Jobs 506, 510, and 511.  [Tr. Day 4, Libassi 60:12-17.]  For Job 506 -- the "Croton open cut" project -- SCC contracted with the NYCDEP to dig a hole for future water treatment plants to be constructed within that excavation.  [Tr. Day 1, Scagnelli 85:5-16.]  For Job 510 -- the South Ferry Project -- SCC and Granite Halmar (in a joint venture) contracted with the MTA to replace an existing subway station and construct a new subway route.  [*Id.* 85:17-86:4.]  Job 511 is the Croton water tunnel project for the DEP, in which SCC constructed a tunnel to bring water down from upstate New York and distribute it into Manhattan.  [*Id.* 86:5-87:20.]

With the foregoing in mind, then, the Court turns to the evidence presented on the lead-up to the federal raid on SCC's corporate office and job site.

C. **2004 Investigation**

In 2004, SCC was a partner in a joint venture with Granite Halmar performing work at the Times Square MTA station – Job 502.  On December 2, 2004, the MTA served a subpoena

---

[its] good faith effort" to see if, in fact, there were additional M/W/DBEs that could be placed on the particular project.  [Cosenzo Dep. 11:14-25.]

on the joint venture seeking records for an investigation into work by SCC and three DBE subcontractors. [Tr. Day 4, Libassi 96:15-25.] Between December 2004 and March 2005, SCC turned over numerous documents to the MTA. [*Id.* 101:19-102:12.]

SCC noticed Dragados about the existence of the investigation, describing it in the Disclosure Letter as follows:

> On December 2, 2004, the Schiavone/Granite Halmar Joint Venture received a subpoena from the Metropolitan Transportation Authority, Office of the Inspector General, for records related to three (3) Disadvantaged Business Enterprise subcontractors (O.J. Painting, New York Stone and Dan Yant, Inc.) performing work on the Times Square project. Records responsive to the subpoena were produced. On February 24, 2005, additional documents were requested with respect to Dan Yant, Inc. On November 9, 2006, an officer and project manager of SCC and one individual employed by Granite Halmar were subpoenaed by the MTA in a "confidential investigation." The witnesses appeared at the hearings and gave testimony; questions were limited to Dan Yant, Inc. To date, SCC has not received any further information regarding the investigation.

[Plf.'s Exh. 2; Defs.' Exh. 135 (hereinafter "Disclosure Letter") § 4.8(a) ¶ 5.]

### D. 2007 Investigation

On January 4, 2007 -- a little less than a year before the parties finalized the SPA -- the MTA Office of Inspector General (sometimes referred to as "MTA-OIG") served a subpoena on SCC in connection with Job 510, the South Ferry project. [Defs.' Exh. 71 (hereinafter "2007 Subpoena"); Tr. Day 4, Libassi 44:12-45:8.] The 2007 Subpoena was served "in connection with a confidential investigation being conducted before the MTA Inspector General," and sought the following documents it alleged were material:

> For the period from June 1, 2004 through the present, any and all documents, contracts, papers, letters, memoranda, reports, correspondence, writings, communications, electronic media, emails, telephone messages, certifications, and identifications pertaining to MTA

Capital Contract Number 05022 – South Ferry Terminal, including but not limited to the following:

1. Employee sign-in sheets for Lashay's Construction & Development Co., Inc. (Lashay's).

2. Logs of debris removal trucks entering and leaving site.

3. Contracts with Lashay's and A. Morrison Trucking, Inc. (Morrison).

4. Documents related to Women Business Enterprise, Minority Business Enterprise or Disadvantaged Business Enterprise status of Lashay's and Morrison, including but not limited to Monthly Progress Reports and Schedules of DBE Participation.

5. Workforce Utilization Forms for Lashay's and Morrison.

6. All communication and correspondence with Lashay's and Morrison and to MTA and or NY Transit relating to those entities.

7. Billings from and payments to Lashay's and Morrison, including cancelled checks (front and back).

8. Identification cards issued for Lashay's and Morrison employees.

9. Employee cards for each employee who has worked, or is working on MTA Capital Contract Number 05022 [Job 510].

10. Front and back of checks made on behalf of Lashay's and Morrison, including checks to CFS Steel Co.

11. Contracts, agreements and proposals from CFS Steel Co.

12. Minutes of project meetings.

13. Breakdown of payments to the Metallic Lather's Unit on behalf of Lashay's and cancelled checks (front and back).

[2007 Subpoena.]  LaShay's Construction & Development Co., Inc. was a DBE subcontractor retained to furnish and install steel rebar on Job 510 and A. Morrison Trucking, Inc. was a DBE retained to provide trucking services on Job 510.  [Tr. Day 4, Libassi 46:1-15; Defs.' Exh. 201

(Sept. 21, 2006 Monthly Contractor DBE Progress Report).]  While the South Ferry project was a SCC joint venture with Granite Halmar, SCC was the "sponsor or the managing partner" responsible for reporting the DBE participation to the MTA.  [Tr. Day 4, Libassi 45:2-24.]

SCC's General Counsel Mary Libassi supervised the production of documents responsive to the 2007 Subpoena and she copied Carl Cosenzo, SCC's executive vice-president, on the cover letters for the documents she turned over to the MTA.  [Tr. Day 4, Libassi 47:17-49-1; Defs.' Exhs. 78, 80.]  Libassi understood that the MTA Office of Inspector General was investigating how SCC was counting DBE participation.  [Tr. Day 4, 49:2-50:4.]  Cliff Brock, the investigator from the MTA Office of the Inspector General, told Libassi that his office intended to interview SCC employees in connection with its investigation. [Defs.' Exh. 180L (Phone-o-Gram Message); Tr. Day 4, Libassi 75:21-77:9.]

On January 9, 2007 – three business days after service of the subpoena – a scheduled meeting of the Executive Committee of SCC was held.  Frederick Bunker, SCC's M/W/DBE's liaison at the time,[8] told the Committee members about the 2007 Subpoena and that the MTA Inspector General's Office was seeking documents related to DBE subcontractors.  [Defs.' Exh. 73 (Jan. 9, 2007 Meeting Minutes) p, 6.]  According to the minutes, Bunker revealed that while "A. Morrison is currently working on the project . . . [t]he only weakness is that [A. Morrison] used other non-DBE truckers to help fulfill his contract with [SCC]," and that the "Rules recognize only DBE truckers for participation purposes."  [Jan. 9, 2007 Meeting Minutes, p. 6; Tr. Day 4, Libassi 50:17-52:11.][9]  Carl Cosenzo, Greg Vasel, Mary Libassi, Paul Scagnelli, Michael Goldstein, Jim Hamill and Rick Bunker -- whose Knowledge is attributable to and

---

[8] [Tr. Day 2, Bunker 74:1-75:3.]
[9] Bunker explained that while the State rules that apply to NYC DEP allow M/WBEs to use non-DBEs, the MTA/NYCT is different because federal rules apply. [Jan. 9, 2007 Meeting Minutes, p.6.]

binding on Donovan pursuant to Exhibit B of the SPA -- were present. [Jan. 9, 2007 Meeting Minutes, p.1; Tr. Day 4, Libassi 50:17-51:6; SPA Exh. B.] According to her regular practice, Libassi sent a hard copy of the Executive Committee Meeting minutes to both Donovan and Schiavone. [Tr. Day 4, Libassi 52:17-54:24.]

The 2007 Subpoena was not disclosed in Sections 4.8(a) or 4.9(c) of the Disclosure Letter. Libassi distinguished the 2007 Subpoena from the 2004 Subpoena disclosed in Paragraph 5 in Section 4.8(a) of the Disclosure Letter, which related to a different SCC project – Job 502, the Times Square MTA station. [Disclosure Letter §§ 4.8(a), 4.9(c); Tr. Day 4, Libassi 57:13-22; *see also infra* Section IIC.] According to Libassi's testimony, and not in dispute, she did not tell Dragados about the 2007 Subpoena or provide Dragados with the minutes of the January 9, 2007 Executive Committee Meeting. [Tr. Day 4, Libassi 55:7-58:20.]

### E. 2008 Search Warrants & Grand Jury Subpoenas

On February 7, 2008, weeks after the parties signed the SPA, search warrants were signed in the District of New Jersey authorizing the seizure of all SCC documents related to Jobs 502, 506, 510, and 511 and all documents related to projects on which SCC utilized certain M/W/DBEs including, but not limited to, T&M Maintenance, A. Morrison Trucking, Dan Yant, J&R Rey Electric, LMS Industrial Distributors, Inc., Wang Engineering, LLC, and LaShay's Construction and Development Co. [Defs.' Exhs. 138, 140 ("2008 Search Warrants").] The 2008 Search Warrants authorized the search of SCC's main office in Secaucus, New Jersey as well as a SCC office trailer located on Job 511's worksite. [*Id.*; Tr. Day 4, Libassi 61:10-20.] Agents of the Federal Bureau of Investigation, U.S. Department of Transportation, U.S. Department of Labor, New York City Department of Investigation, and the Internal Revenue Service arrived at SCC's corporate offices and conducted the search on behalf of the Inspectors

General of the DEP and the MTA.  [Tr. Day 4, Libassi 59:2-7; *id.* ("there w[ere] about 20 people . . . who came to the office with guns drawn and executed th[e] search warrants.").]

On the same day, SCC was served with two more subpoenas issued by the United States District Court for the Eastern District of New York upon application by AUSA Daniel Brownell. [Defs.' Exhs. 137, 139 ("2008 Subpoenas"); Tr. Day 4, Libassi 62:19-63:2.]  The 2008 Subpoenas demanded documents similar to those authorized to be seized by the 2008 Search Warrants along with all contract documents including, but not limited to, M/W/DBE utilization worksheets and approvals and requests for sub-contractor approval.  [2008 Subpoenas.]  SCC, now owned by Dragados, produced voluminous documents in response.  [Tr. Day 4, Libassi 63:12-64:1.]

Bryan Cave LLP was retained to represent SCC and several individual employees during the government's investigation and to act as a liaison with the U.S. Attorney's Office.  [Tr. Day 4, Libassi 64:2-22.]  SCC also authorized the retention of John Ryan, a private investigator tasked with interviewing the DBEs referenced in the 2008 Search Warrants and Subpoenas; a computer consultant to copy the data seized by the government (FTI consulting); and a copy company to duplicate the documents seized by the government (Ikon).  [*Id.* 64:23-67:18.] Kelley Drye & Warren LLP was separately retained to represent Dragados.  [Tr. Day 4, Lopez 118:12-25.]

### F.  M/W/DBE Compliance Audit

After the 2008 raid, and while negotiating with the federal government to resolve the potential criminal charges against SCC, Dragados hired Lorraine D'Angelo as a compliance officer and insisted that she report directly to Dragados.  [Tr. Day 3, D'Angelo 54:7-12.] D'Angelo undertook an audit of SCC's M/W/DBE participation, including a review of reports

submitted to the MTA and DEP in connection with Jobs 506, 510, and 511 – jobs identified in the 2008 Search Warrants.  [*Id.* 54:3-55:25; 2008 Search Warrants.]   As part of her audit, D'Angelo reviewed previously filed participation reports, checked to see if all claimed M/W/DBE firms were certified to perform the specified work, ensured claimed M/W/DBEs performed a commercially useful function, and gathered utilization plans, correspondence, invoices, and accounting records showing payment to the M/W/DBEs.  [*Id.* 56:1-22.] Over objection,[10] D'Angelo testified that her audit revealed SCC had submitted inaccurate reports on Jobs 506, 510, and 511 that overstated M/W/DBE subcontractor participation by more than $27,000,000 and possibly as much as $40,000,000.  [Tr. Day 3, D'Angelo 57:7-8, 86:5-8, 89:7-

---

[10] Before trial, Donovan moved *in limine* to exclude D'Angelo's testimony on the basis that she was not identified as an expert in the final pretrial order and purportedly lacked the requisite personal knowledge to render lay opinions on matters that occurred prior to her tenure at SCC. [D.E. 210; *see also* Tr. Day 1, Garrod 11:10-20, 12:1-13:14, 14:22-17:16, 18:18-19:7, 19:22-20:11.]  In opposition, Dragados argued that: (1) the ruling Donovan sought was premature as it would be more appropriate for the Court to rule on specific objections to D'Angelo's testimony as the trial proceeded; (2) D'Angelo was not being offered as an expert; and (3) the rules of evidence allow D'Angelo to testify regarding matters that are reflected in SCC's business records that she reviewed in connection with her job as SCC's compliance officer. [D.E. 213; *see also* Tr. Day 1, Zalman 20:14-22:11.]  After hearing both parties' arguments at the pretrial *in limine* hearing, the Court denied Donovan's request to strike D'Angelo's testimony and decided to rule on the substance of Donovan's motion in context as the questions were asked.  [Tr. Day 1, Court 22:24-23:3, 23:22-25.]   At the conclusion of D'Angelo's testimony, the Court again addressed Donovan's *in limine* motion and elaborated upon its basis for permitting her testimony.  To that end, the Court was satisfied that D'Angelo's testimony was based upon her personal review of progress reports, utilization plans, accounting reports, etc., for active pending jobs – including Jobs 506, 510, and 511.  Additionally, the Court found that the contents of the reports referred to by D'Angelo were not inadmissible hearsay or so prejudicial to the plaintiff as to create evidentiary improprieties.  With respect to several objections that were overruled, related to letters D'Angelo sent to the DEP and MTA correcting prior M/W/DBE reports (Defs.' Exhs. 174-177), the Court found that these documents were admissible under the business records exception and/or because the rules of evidence and supporting case law allow witnesses to testify as to the content of records reviewed in an official capacity.  The Court concluded that D'Angelo fulfilled the guidance and requirements of Fed. R. Evid. 701 as her opinion testimony was rationally based on her perception of the business records and was helpful to clearly understand her testimony.  [Tr. Day 4, Court 33:2-38:7 (citing case law).]

11.]  Based on the audit, SCC submitted correction letters that reduced or eliminated the participation that it had claimed on each job.  [*Id.* 57:2-13; *see, e.g.,* Defs.' Exhs. 174, 176, 177.]

### 1.  Job 506 Audit Results[11]

Jo-Di Trucking Inc. is a WBE subcontractor retained to provide trucking and disposal of material services for Job 506.  [Defs.' Exhs. 25, 34 (08/11/05 and 10/24/05 Reports to DEP for Job 506).]  On October 30, 2006, Melanie Swalm -- SCC's Compliance Manager at the time[12] -- alerted the project manager for Job 506, Pat Rooney that "[a]t this point, Jo-Di does not own any trucks and are using non MWBE truckers," and warned that "we will not be credited for this anymore should the DEP find out about this . . This may cause us problems in the future with our MWBE credits."  [Defs.' Exh. 61 (10/30/06 Email from Swalm to Rooney cc'ing Cosenzo); Tr. Day 2, Swalm 21:24-22:3, 31:19-25).]  In addition to copying Cosenzo on the above email, Swalm informed Bunker that Jo-Di no longer owned trucks. [Tr. Day 2, Bunker 112:10-16, 113:19-20.]  Also on October 30, 2006, SCC submitted a utilization plan and progress report to the DEP for Job 506 that increased the contract value for Jo-Di from $620,550 to $1,426,846.46. [Defs. Exh. 60 (10/30/06 DEP Report for Job 506); Tr. Day 2, Bunker 112:6-9.]  By July 17, 2007, SCC had increased Jo-Di's contract value for Job 506 to $1,518,567.44.  [Defs. Exhs. 72, 96 (01/08/07 and 07/17/07 DEP Reports for Job 506); Tr. Day 2, Swalm 32:13-34:3.]  After D'Angelo's audit, Dragados was unable to determine whether Jo-Di actually had any trucks so SCC removed Jo-Di's WBE participation from Job 506 in the amount of $1,519,058.75.  [Defs.' Exh. 174 (07/15/09 DEP Report); Tr. Day 3, D'Angelo 72:22-73:10; Tr. Day 2, Bunker 114:24-115:6.]

---

[11] The audit results contained in sections F(1)-(3) serve as examples of miscounted M/W/DBE participation found during D'Angelo's audit and do not represent her complete findings.

[12] Melanie Swalm was dismissed from SCC in January 11, 2012.  [Tr. Day 2, Swalm 53:12-17.]

SCC also submitted participation reports for Wang Engineering, a MBE subcontractor retained on Jobs 506 and 511 to provide vibrational analysis, explosives, blasting and pre- and post- construction survey services. [Defs. Exhs. 120, 126 (Utilization plan & progress report to DEP).] Because D'Angelo's audit determined that SCC personnel rather than Wang ordered the explosives, SCC reduced Wang's MBE participation for Job 506 for the cost of explosives in the amount of $6,255,936.32. [Defs.' Exh. 174 (07/15/09 DEP Report for Job 506); Tr. Day 3, D'Angelo 74:7-75:23.] SCC also reduced WBE participation for MF Transportation in the amount of $1,738,809.07 after the audit revealed that it was not certified as a WBE to provide trucking services. [Defs.' Exh. 174 (07/15/09 DEP Report for Job 506); Tr. Day 3, D'Angelo 73:11-74:3.]

In addition, SCC had claimed participation credit for T&M Maintenance Inc. as a WBE subcontractor retained to provide trucking and disposal of material services for Jobs 506 and 511. [Defs. Exhs. 120, 126 (Utilization plan & progress report to DEP).] In 2004, in connection with another job, the DEP notified SCC that T&M was not using any of its own trucks to perform work and Bunker – the M/W/DBE liaison, on behalf of SCC, replied to DEP confirming that he was aware that T&M "did not actually have any trucks, and was utilizing trucks of a relation, Andrews Trucking, a non-M/WBE." [Defs.' Exh. 5 (06/25/04 Letter from Bunker to DEP).] Despite the foregoing, SCC increased the contract value for T&M on a number of reports submitted to the DEP resulting in a total contract value of over $6,000,000. [Defs.' Exh. 96 (07/17/07 DEP Report for Job 506).] Based on D'Angelo's audit, SCC reduced T&M's WBE participation for Job 506 in the amount of $6,124.245.75. [Defs.' Exh. 174 [07/15/09 DEP Progress Report for Job 506); Tr. Day 3, D'Angelo 64:17-65:18, 70:10-19, 72:8-9.]

## 2. Job 510 Audit Results

Job 510 – the South Ferry Project – was a SCC and Granite Halmar joint venture in which they contracted with the MTA to replace an existing subway station and construct a new subway route. [Tr. Day 1, Scagnelli 85:17-86:4.] A. Morrison Trucking Inc. was the DBE subcontractor retained to provide trucking services on Job 510.

How SCC counted A. Morrison was the subject of the Minutes of the SCC Executive Committee meeting referenced earlier. According to them, Richard Bunker reported to the others that under MTA rules, SCC had improperly counted the trucking DBE participation:

> Rick [Bunker] informed that we have received a subpoena from the MTA/IG with respect to a DBE subcontractor (LaShay's Construction) for rebar (furnish and install) and a DBE trucker (A. Morrison Trucking) on the South Ferry Project. A. Morrison is currently working on the project. The only weakness is that he used other non-DBE truckers to help fulfill his contract with us. The Rules recognize only DBE truckers for participation purposes. Carl [Cosenzo] said that NYCDEP allows M/WBEs to use non-DBE truckers. Rick said that State rules apply to NYCDEP. We spoke to the compliance people and they are aware of the situation on Croton and Water Tunnel. The MTA/NYCT is different; federal rules apply.

[Jan. 7, 2009 Meeting Minutes p.6; Tr. Day 2, Bunker 89:15-92:13.]

Notwithstanding, SCC did not inform the MTA (or, later on, Dragados) that SCC was taking full participation credit for all monies paid to A. Morrison. [Tr. Day 2, Bunker 94:7-10.] In fact, on March 20, 2007, after the Executive Committee meeting, SCC increased the participation value of A. Morrison Trucking on Job 510 to $5,559,860. [Tr. Day 2, Bunker 94:11-95:1; Defs.' Exh. 83 (03/20/07 Letter updating DBE participation to MTA, cc'ing Cosenzo, Scagnelli, and Goldstein).] On November 9, 2007, SCC again increased A. Morrison's participation to $5,589,409. [Defs.' Exh. 124 (11/09/07 Letter updating DBE participation to MTA, cc'ing Cosenzo and Scagnelli).]

As part of D'Angelo's audit, SCC reviewed the trucking tickets from A. Morrison on Job 510. [Tr. Day 2, Bunker 98:13-99:14, 100:3-101:12.] These tickets show which trucker was on the job site on any given day. [Tr. Day 3, D'Angelo 70:20-71:9.] The audit revealed, and A. Morrison later confirmed, that although SCC reported to the MTA that A. Morrison performed more than $5,500,000 of trucking work, it had actually only performed $1,141,741 in work and a non-DBE (Andrews Trucking) had performed the remaining work. [Defs.' Exhs. 159, 165 (03/07/08 and 03/17/08 SCC Letters to MTA correcting Morrison DBE participation for Job 510); Tr. Day 2, Bunker 104:25-105:12, 106:2-107:5.] A. Morrison's records indicated that it claimed a $378,051.77 commission for non-DBE trucks. [Defs.' Exh. 165.] Progress reports for Job 510 uniformly reflected that SCC responded "No" to the following question: "Did any of the DBE subcontractor[s] subcontract any portion of its work to a non-DBE during the report period?" [Defs.' Exhs. 51, 59, 63, 69, 75, 76, 82-85, 89, 99, 104, 114, 117, 125, 136, 185-194, 196-201 (Progress Reports to MTA for Job 510); Tr. Day 2, Bunker 89:15-92:13.] In its correction letter to the MTA, SCC reduced its DBE participation value for A. Morrison to $1,519,793.16 – a reduction of $4,069,616.10 from what it previously claimed. [*Id.*; Tr. Day 2, Bunker 107:17-108:6.]

According to the audit, LMS – another DBE company SCC counted on Job 510 – was not certified as a DBE to supply lumber and was not performing a commercially useful function because it was merely picking up lumber. [Tr. Day 3, D'Angelo 82:6-13, 84:4-85:13; Defs. Exh. 176, p.1 (09/29/09 Letter to MTA modifying DBE participation); *see also* Cosenzo Dep. 36:25-37:14.] In its correction letter, SCC removed LMS's participation for Job 510 in the amount of $889,709.55. [Tr. Day 3, D'Angelo 85:11-13; Defs. Exh. 176, p.1.] Similarly, D'Angelo discovered that LaShay's – a DBE listed in the 2007 Subpoena – was not providing a

commercially useful function as it was only furnishing labor and not providing the rebar materials to Job 510, something known at the time to SCC management. [Cosenzo Dep. 39:25-40:7 (noting that he was aware that LaShay's may not be performing commercially useful function prior to the review).] After the audit, SCC removed LaShay's participation for Job 510 in the amount of $599,582.50. [Defs.' Exh. 176 (09/29/09 Letter to MTA modifying DBE participation, p.2.]

### 3. Job 511 Audit Results

Wang Engineering Services is a MBE subcontractor retained on Jobs 506 and 511 to provide vibrational analysis, explosives, blasting and pre- and post- construction survey services. Wang Engineering was using employees from an associated company on Job 511, and as a result SCC removed $34,726 in participation. [Defs.' Exhs. 177, 120, 126 (Progress Reports to DEP); Tr. Day 3, D'Angelo 78:20-79:18.] As with Job 506, SCC removed T&M Maintenance's M/WBE participation in the amount of $1,285,730 because T&M had previously been rejected by the DEP as the subcontractor and because SCC could not confirm that they had any trucks on the project. [Tr. Day 3, D'Angelo 78:3-15; Defs.' Exhs. 177 (Progress Report to DEP).]

### G. Non-Prosecution Agreement

Several months after the 2008 Search Warrants and Subpoenas were executed, Libassi and SCC's counsel from Bryan Cave met with AUSA Brownell, who was in charge of the government's criminal investigation into SCC, Christopher Hayes from the Civil Division of the U.S. Attorney's Office, and Mike Carol from the DEP Department of Investigation. [Tr. Day 4, Libassi 68:20-69:21.] Brownell told Libassi and SCC's counsel that, from the material he had reviewed, including secretly recorded tapes and documents, SCC had improperly counted M/W/DBE participation for DBEs that had not actually done the work. [*Id.* 71:5-11; 71:24-

72:2.] Brownell indicated that Bunker had been taped by Joe Vollaro[13] and his statements showed that SCC knew that its counting of DBE participation was wrong. [*Id.* 72:4-12.] When Bunker testified, a recording of the taped conversation was played and Bunker identified the speakers.[14] [Tr. Day 2, Bunker 127:1-131:9.] The tape establishes that Bunker knew the government was investigating minority participation programs and that he was reluctant to talk to T&M and Andrew's representatives unless it was face-to-face in the event the phones were tapped. [*Id.* 135:2-136:7.] Bunker acknowledges in the taped conversation that he knew it was inappropriate -- and circumvented the purpose of the DBE program -- to use Andrew's to haul material for the water tunnel project (Job 511) while claiming credit for using T&M – a DBE that did not have any trucks. [*Id.* 137:2-138:17.] Brownell stated that SCC's conduct could be

---

[13] Joe Vollaro is the owner of Andrews Trucking – a non-DBE trucking company that was used by T&M Maintenance and provided trucks on Job 506. [Cosenzo Dep. 45:3-7.] He was a confidential informant for the government and wore a wire. [Tr. Day 2, Kinsler 56:23-57:3.]

[14] Donovan objected to the admissibility on grounds of authenticity and because the tape was irrelevant hearsay. [D.E. 233.] With respect to the tape authenticity, Dragados argued that the tape would be properly authenticated through "testimony of a witness with knowledge [Bunker] . . . that an item is what it is claimed to be. . . ." [D.E. 234 at 5-6 (quoting Fed. R. Evid. 901(b)(1), (b)(5)).] Moreover, Dragados pointed out that Donovan was aware of the provenance of the tape and had access to the tape for at least two years prior to trial. [*Id.* at 2.] Further, before trial, Dragados identified specific portions of the tape that it intended to play and provided Donovan with a transcript of those portions as a demonstrative exhibit. [*Id.* at 3; Tr. Day 2, Kinzler 57:7-19 (explaining the provenance of the tape and its production of the tape to Donovan several years earlier).] With respect to the tape's relevance, Dragados argued that the tape goes to the reasonableness of the settlement. [*Id.* at 4 (citing Fed. R. Evid. 401).] Finally, Dragados stated that the tape does not constitute inadmissible hearsay because it was being offered to show what was stated during the conversation, not the truth of what was stated. [*Id.* (citing Fed. R. Evid. 801(c)(2) and case law); *see also* Tr. Day 2, Kinsler 55:13-56:3.] After Dragados's attorney laid a foundation with Bunker -- establishing that he had knowledge sufficient to show that the tape was a recorded conversation to which he was a party -- the Court ruled that Dragados had adequately established the tape's authenticity. [Tr. Day 2, Court 65:10-67-11 (quoting Fed. R. Evid. 901(b)(1) and (b)(5)); *see also id.* at 70:13-15, 131:10-134:24.] The Court also found that the tape was relevant to whether the tape's inculpatory nature justified Dragados's decision to settle with the government -- an issue raised by Donovan. Similarly, with respect to Donovan's hearsay objection, the Court admitted Bunker's testimony regarding the tape as evidence not of the truth of the recorded statements, but as evidence of what the government had by way of evidence against SCC. [Tr. Day 2, Court 60:3-61:4, 69:1-5.]

considered fraud and that SCC could be indicted.  [Tr. Day 4, Libassi 71:12-18.] AUSA Hayes said that the Civil Division could assert False Claims Act and RICO violation claims, which exposed SCC to damages of up to three times the value of the false reporting. [*Id.* 72:13-25.] During the meeting, SCC agreed to cooperate with the government's continuing investigation, and to provide witnesses for government interviews.  [*Id.* 73:4-7.]

In August 2010, there was a meeting between SCC representatives – Libassi, counsel for SCC from Bryan Cave, and counsel for Dragados from Kelley Drye – and AUSAs Brownell and Hayes, Cliff Brock from the MTA Office of the Inspector General, and Doug Schumacher and Richard McGrade from the U.S. Department of Transportation.  [*Id.* 73:8-74:1.] The purpose was to discuss a resolution of the ongoing criminal investigation. [*Id.* 77:10-19.] The government attorneys told SCC that contrary to SCC's hopes for a purely civil settlement, the government had enough evidence to indict.  As a consequence, SCC was told that any settlement would require a criminal component through a deferred prosecution agreement as well as a financial penalty of between $25,000,000 and $30,000,000.  [*Id.* 78:8-20.]  The fine was calculated based on the difference between what SCC had originally reported as M/W/DBE participation and the amounts that SCC had later corrected and provided to the government agencies.  [*Id.*; *see also infra.* Section IIF (corrected reports).]  In addition, the government lawyers were concerned that two SCC employees, Bunker and Cosenzo, were still working at the company despite having been involved in the inaccurate M/W/DBE participation reporting.  [Tr. Day 4, Libassi 78:21-79:24, 85:5-16.]  According to DOT's attorney it was likely that SCC would have to attend a debarment hearing in Washington D.C..  [*Id.* 79:25-80:21, 82:9-83:4.]  AUSA Hayes added that if the government pursued civil claims against SCC under the False Claims Act, the government

would not settle for less than 2.5 times the value of the aggregate, or between $62,500,000 and $75,000,000. [*Id.* 83:5-84:11.]

After the meeting, SCC decided that Cosenzo and Bunker could resign or be terminated. [*Id.* 85:21-24.]

In a subsequent phone conference, AUSA Brownell told Libassi, D'Angelo, and SCC's counsel at Bryan Cave that the U.S. Attorney's office was willing to offer SCC a non-prosecution agreement, as opposed to a deferred prosecution agreement, because of the proactive compliance work SCC had done after the raid and under the control of Dragados. [*Id.* 85:25-86:3, 86:24-87:6.] The parties agreed to have a face-to-face meeting to discuss what, if any, mitigation credit SCC could be entitled to. [*Id.* 87:6-22.]

Jose Antonio Lopez, President of Dragados and SCC at the time, testified that he was informed of the government's mounting evidence against SCC, including the secretly recorded tapes and the incorrect information submitted to the MTA and DEP. [Tr. Day 4, Lopez 121:11-17, 156:7-10.] According to Lopez, an indictment would mean that SCC would be out of business and unable to keep bidding on projects until the issue was resolved. [*Id.* 120:13-19; 122:19-25.] In addition, an indictment would adversely affect Dragados-related entities doing business in the United States. [*Id.* 119:18-22; 124:3-4; 124:7-17.] Lopez stated that he had an interest in preventing individual SCC employees from being indicted and wanted to pay the least amount of money as possible. [*Id.* 120:2-3.]

In December 2010, after further negotiations, SCC and the government reached a non-prosecution agreement whereby SCC would not be indicted in exchange for its execution of a stipulation of settlement and decree of forfeiture to the federal government of $20,000,000. [Defs.' Exhs. 398 ("Non-Prosecution Agreement") at 3; 408 ("complaint in rem"); 409

("Stipulation of Settlement and Decree of Forfeiture"); Tr. Day 4, Libassi 87:23-95:3.] In addition, the agreement called for SCC to pay investigative costs to the MTA and DEP of approximately $2,370,000 and mandated implementation of a compliance office at SCC to ensure it adhered to the M/W/DBE program requirements. [Non-Prosecution Agreement at 3-4.]

The civil forfeiture complaint specifically referenced Jobs 506, 510, and 511, and recited that SCC had engaged in a scheme to defraud the government by submitting false M/W/DBE reports in violation of 49 C.F.R. Part 26 and New York Executive Law Article 15-a. [*See generally* complaint in rem; Tr. Day 4, Libassi 90:9-91:16.]

SCC issued checks payable to the U.S. Department of the Treasury ($20,000,000), the New York City – Department of Investigation ($539,760), and the MTA-OIG ($1,833,500) on December 13, 2010. [Defs.' Exhs. 403, 405, 407 (copies of checks).]

**H. Payments Made to Donovan under the SPA**

After SCC's offices were raided, by letters dated February 27, 2008, March 6, 2008, and December 15, 2008, Dragados informed Donovan and Schiavone that it was seeking indemnification in accordance with SPA Sections 10.1(a) and 10.1(b) for losses arising from breaches of Article IV of the SPA incurred by Dragados in connection with the investigations by several government agencies for possible noncompliance with M/W/DBE rules and regulations. [Defs.' Exhs. 154, 158, 170 ("Indemnification Notices").] In addition, Dragados stated that "to preserve its right of offset under Section 10.5 of the [SPA]," it would "not make any Installment Payment or payment for any credit balance for Pre-Closing Tax Periods." [Defs.' Exh. 170.] Dragados did not make the Installment Payment ($10,000,000 plus 7% interest per year each) or the pre-closing tax payments ($880,006 NYC General Corporation Tax credit + $4,686 NY State

franchise tax refund for a total of $884,692 or $442,346 each) to Donovan and Schiavone. [Pl.'s Exhs. 52, 63, 64; Tr. Day 1, Donovan 63:4-7.]

By letters dated December 23, 2008 and December 30, 2008, Donovan and Schiavone notified Dragados that its failure to make the payments required by Sections 2.2 and 11.5(a) of the SPA constituted a breach of the covenant to pay. [Pl.'s Exhs. 53 and 54.] One month later, Donovan and Schiavone filed their breach of contract suits against Donovan. [D.E. 1, 19-4.]

## IV.  DISCUSSION & ANALYSIS

The parties dispute how the foregoing facts apply to their respective rights under the SPA. Donovan argues that the payment and indemnification provisions of the SPA entitle him to collect the Installment Payment ($10,000,000 x 7% interest per year), his portion of the pre-closing tax refund ($442,346), and reasonable fees and costs expended in enforcing his rights under the SPA. Dragados argues that it was relieved of its obligation to pay him anything more than it did at the closing in December 2007 in light of Donovan's material breaches of the representations and warranties in the SPA. The counterclaim asserts that the SPA requires Donovan to reimburse Dragados for the fines and investigative costs Dragados paid to the various government agencies, as well as the legal fees it incurred over the years it negotiated and ultimately settled with the government, and its costs in the within lawsuit.

Because Dragados acknowledges that it has not paid the Installment Payment and Donovan's portion of the pre-closing tax refunds, the bulk of the trial concerned Dragados's proofs on the counterclaim, which are examined below.

### A.  Breach of Contract

Under New Jersey law, to succeed on a claim for breach of contract, a party must establish: (1) the existence of a valid contract, (2) defective performance by the defendant that

resulted in a breach, and (3) resulting damages. *MacWilliams v. BP Products N. Am. Inc.*, No. 09-1844, 2010 WL 4860629, *6 (D.N.J., Nov. 23, 2010) (Kugler, J.) (citing *Coyle v. Englander's,* 199 N.J. Super. 212, (App. Div. 1985)). Neither party disputes that the SPA constitutes a valid contract. Rather, the parties' contentions lie with the second and third elements of the contract claim, *i.e.*, whether Donovan breached the contract by making misrepresentations and whether Dragados suffered damages as a result.

"A party adequately pleads a breach of contract claim if it alleges a breach of the contract's representations and warranties provisions." *Inventory Recovery Corp. v. Gabriel*, No. 01604, 2012 WL 2990693, *4 (D.N.J. July 20, 2012) (Martini, J.); *See also Leder v. Shinfeld,* 609 F. Supp. 2d 386, 406–07 (E.D. Pa. 2009) (allegations that defendant violated "representations and warranties of seller" in a stock purchase agreement were sufficient to state a claim for breach of contract). To prove resulting damages, the party must have suffered a quantifiable loss that was a natural and probable consequence of the defendant's breach. *See MacWilliams, supra,* *6 (quoting *Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C.,* 191 N.J. 1, 13 (2007)).

**B. Dragados Alleges Donovan Breached the SPA**

According to Dragados, when deciding whether to purchase SCC, it relied upon specific representations made by Donovan and Schiavone in the SPA. [D.E. 246 (hereinafter "Defs.' Post-Trial Summ."), p.3; *see also* Tr. Day 4, Lopez 116:16-117:11, 117:19-118:5.] Dragados contends that Donovan breached three of those representations by failing to disclose: (1) the government's investigation of SCC, including the 2007 Subpoena; (2) that SCC had submitted inaccurate reports to the MTA and DEP in violation of the law -- as defined in the SPA; and

(3) that SCC's Books and Records were inaccurate because, at a minimum, they overstated credits for M/W/DBE participation.

### 1. SPA Sections 4.8(a) & 4.9(c) – Failure to Disclose Material Facts

In Section 4.8(a) of the SPA, Donovan represented and warranted to Dragados that: "Except as set forth in Section 4.8(a) of the Disclosure Letter . . . no material investigation or inquiry by or before any Governmental Authority is pending or, to the Knowledge of SCC, threatened against SCC."  [SPA § 4.8(a).]  Under Section 4.9(c), Donovan further represented and warranted to Dragados that: "Except as set forth in Section 4.9(c) of the Disclosure Letter . . . none of SCC . . . has received any written notice from any Government Authority that, or otherwise has any Knowledge that [ ] alleges any material noncompliance (or that SCC . . . is under investigation or the subject of an inquiry by any such Governmental Authority for such alleged noncompliance) with any applicable Law . . ."  [*Id.* § 4.9(c).]

Dragados submits that Donovan breached Sections 4.8(a) and 4.9(c) by failing to disclose the government's investigation into SCC's M/W/DBE practices – most notably the issuance of the 2007 Subpoena – even though he and others at SCC were fully aware of the investigation. [Defs.' Post-Trial Summ., p. 4-5.] Specifically, Dragados argues that at the January 9, 2007 Executive Committee Meeting, Bunker – SCC's M/W/DBE compliance officer at the time – disclosed to SCC Executives, whose knowledge is attributable to Donovan under the SPA, that SCC received the 2007 Subpoena and conceded that SCC submitted reports in connection with Job 510 that contained inaccurate information.  [*Id.*, p. 7-8 (citing Jan. 9, 2007 Meeting Mins.; Tr. Day 4, Libassi 52:17-54:24).]  Further, Dragados contends that SCC's General Counsel, Mary Libassi, whose knowledge is also binding on Donovan, was informed by MTA Investigator, Cliff Brock, that the 2007 Subpoena was issued in connection with the MTA's

investigation into SCC's counting of DBE participation. [Defs.' Post-Trial Summ., p. 8-9 (citing Tr. Day 4, Libassi 52:17-54:24).] It necessarily follows, Dragados argues, that Donovan made material misrepresentations in Sections 4.8(a) and 4.9(c) in breach of the SPA by failing to disclose the 2007 investigation in the Disclosure Letter or in communications with Dragados prior to closing. [Defs.' Post-Trial Summ., p. 9-10.]

In opposition, Donovan argues that Dragados has not proved that he breached Section 4.9(c) because there is no evidence that "written notice" from a government agency existed at any time prior to the closing date indicating that SCC was under investigation for material noncompliance with the law. [D.E. 245 (hereinafter "Pl.'s Post-Trial Summ." p. 6-7, 18).] Donovan asserts that the 2007 Subpoena does not constitute written notice that SCC was under investigation because the subpoena sought records on a joint venture and the subject of the subpoena was a "confidential investigation" – not SCC. [*Id.*] Donovan states that SCC personnel testified that they did not have any knowledge that SCC was the subject of a pending investigation prior to the closing date. [*Id.* 11, 21 (citing trial testimony).] Donovan also argues that Dragados has failed to show that he breached Section 4.8(a) because there is no evidence of an announcement or expression of intent to investigate by a government agency, which he alleges is required to prove that a material investigation was "pending" or "threatened." [*Id.*, p. 8, 10, 14.]

The Court is not persuaded by Donovan's argument that SCC did not breach its representation because, at the time the SPA was signed, he was unaware that SCC was being investigated as no written notice or announcement regarding the investigation was made by any governmental agencies. The 2007 Subpoena pertained to SCC's use of certain DBEs and despite the fact that Job 510 was a Granite Halmar joint venture, SCC was the "sponsor or the managing

partner" responsible for reporting the DBE participation to the MTA. [Tr. Day 4, Libassi 45:2-24.] Further, the Court finds relevant and credible Libassi's testimony that establishes that she understood that the MTA Office of Inspector General was investigating how SCC was counting DBE participation. [Tr. Day 4, 49:2-50:4, 75:21-77:9.] Other SCC higher-ups, specifically the members of SCC's Executive Committee -- whose knowledge is imputed to Donovan -- were fully aware of the MTA's investigation after they learned of the 2007 Subpoena and Bunker told them about SCC's inaccurate reports submitted for Job 510 at the January 9, 2007 meeting. [Jan. 9, 2007 Meeting Mins.; Tr. Day 4, Libassi 52:17-54:24).][15]

At trial, Donovan attempted to support his argument that SCC personnel did not know SCC was the subject of a pending investigation in various ways that ultimately were unpersuasive. For example, Donovan's recourse to the discovery and the trial transcript for cryptic or incomplete statements does not add up to a coherent or persuasive presentation. The 2007 Subpoena, which was disclosed during the Executive Committee Meeting, and Cliff Brock's statements to Libassi constitute expressions of intent to investigate by the MTA. But even absent such convincing evidence, Sections 4.8(a) and 4.9(c) of the SPA do not require "an announcement or expression" as Donovan suggests. Rather, these provisions solely require "the knowledge of SCC" including that of Libassi and other members of the Executive Board. [*See* SPA § 4.8(a) (where Donovan represented that "SCC has furnished . . . a complete list of each . . . action, claim . . . or other proceeding that has been instituted, *or to the knowledge of SCC*, threatened against, by or affecting SCC."); *id.* § 4.9(c) (where Donovan represented that except

---

[15] As noted above, Carl Cosenzo, Greg Vasel, Mary Libassi, Paul Scagnelli, Michael Goldstein, Jim Hamill and Rick Bunker -- whose Knowledge is attributable to and binding on Donovan pursuant to Exhibit B of the SPA -- were present at the January 9, 2007 Executive Committee Meeting. [Jan. 9, 2007 Meeting Minutes, p.1; Tr. Day 4, Libassi 50:17-51:6; SPA Exh. B.] According to her regular practice, Libassi sent a hard copy of the Executive Committee Meeting minutes to both Donovan and Schiavone. [Tr. Day 4, Libassi 52:17-54:24.]

as set forth in the Disclosure Letter, "none of SCC . . . or the Shareholders has received any written notice from any Governmental Authority that, *or otherwise has any Knowledge that*, alleges any material noncompliance . . . with applicable law or could reasonably be expected to result in a material fine. . .").]

In the alternative, Donovan argues that the 2007 "confidential investigation" was in fact disclosed to Dragados because it was a continuation of the 2004 investigation referenced in Section 4.8(a), Paragraph 5 of the Disclosure Letter. [Pl.'s Post-Trial Summ., p. 15, 18.] This is unpersuasive on two fronts. Evidence at trial indicated that the 2007 investigation was distinguishable from the 2004 investigation because it was about a different project and different subcontractors. And, as Dragados points out, Donovan effectively nullified the "continuation" argument when he specifically represented in the Disclosure Letter that, with respect to the 2004 Subpoena: "To date, SCC has not received any further information regarding the investigation." [Defs.' Post-Trial Summ., p. 10 (citing Disclosure Letter §4.8(a)); Tr. Day 4, Libassi 57:13-22).]

Regarding damages, Donovan contends that assuming the 2007 investigation was distinct, Dragados has failed to establish a causal connection between its claimed losses and the "confidential investigation" that was the subject of 2007 Subpoena. [Pl.'s Post-Trial Summ., p. 30-31.] In this respect, Donovan argues that the 2008 Search Warrants and Subpoenas could not have been predicted or disclosed in the SPA because they represent an entirely separate investigation from the 2007 Subpoena and were the first announcements that the U.S. Attorney was investigating SCC. [*Id.*, p. 13-15, 20.] This argument fails to recognize the overwhelming proofs that the attorneys' fees and settlement costs Dragados incurred in avoiding a criminal indictment directly stem from SCC's pre-closing inaccurate M/W/DBE plans and reports. [Defs.' Post-Trial Summ., p. 33-34.] And directly counter to Donovan's position, the 2008

Search Warrants and Subpoenas requested documents relating to SCC's use of certain DBEs on Jobs 506, 510 and 511. [*See, supra,* Section IIF; 2008 Subpoena & Search Warrants; Tr. Day 4, Libassi 58:21-62:18.]

Based on the foregoing, the Court finds that Donovan breached the SPA by representing that, with the exception of that which was disclosed, no action or proceeding had been instituted or threatened by any governmental authority that would affect SCC in violation of Sections 4.8(a) and 4.9(c) of the SPA. Moreover, the facts demonstrate that the fees and costs incurred in Dragados's negotiations and ultimate settlement with the government were the "natural and probable consequences" of Donovan's misrepresentations. *MacWilliams, supra,* \*6 (quoting *Totaro,* 191 N.J. at 13). There can be no question that the 2007 Subpoena and the knowledge of SCC's Executive Committee that SCC had overstated DBE participation on certain jobs are significant facts that any purchaser would want to know before committing to spend $150,000,000. [Defs.' Post-Trial Summ., p. 10-11.]

## 2. SPA Section 4.9(a) – Submitting Inaccurate M/W/DBE Reports in Violation of the Law and Maintaining Inaccurate Books & Records

Donovan represented and warranted in Section 4.9(a) of the SPA that "SCC, each of its Subsidiaries, PPR and the Shareholders . . . are, and have been at all times, in compliance in all material respects with all applicable Laws." [SPA § 4.9(a)] In that subsection, Donovan also represented that "[a]ll Books and Records . . . of SCC and its Subsidiaries have been maintained, in all material respects, accurately and in accordance with applicable Law." [*Id.*] "Books and Records" are defined in the SPA as "compliance records, . . . and other materials prepared for or filed with Governmental Authorities regulating the businesses of SCC and its Subsidiaries . . ." [*Id.* § 1.1.]

Dragados argues Donovan breached Section 4.9(a) because SCC submitted reports to government agencies that were both in violation of applicable laws and regulations and materially inaccurate. [Defs.' Post-Trial Summ., p. 11.] Specifically, Dragados alleges that SCC repeatedly submitted utilization plans and progress reports to the MTA and DEP regarding M/W/DBE participation on Jobs 506, 510, and 511 that contained incorrect information. [*Id.*]

Dragados states that D'Angelo's audit of SCC's M/W/DBE participation revealed that SCC's reports to the MTA on Job 510 violated 49 C.F.R. § 26.55 which mandates that contractors working on a DBE job (like SCC) submit reports to the MTA accurately reflecting the value of the work "actually performed" by a certified DBE subcontractor or the value attributable to work by a certified DBE subcontractor "perform[ing] a commercially useful function." [*Id.*, p. 12-13, 19-26 (citing trial exhibits and testimony regarding the inaccuracies of the MTA reports); *see also supra* Section IIF.] Dragados states that the audit also revealed that the submission of inaccurate reports to the DEP on Jobs 506 and 511 violated New York Executive Law Article 15-a, 40 C.F.R. Part 35, and the EPA's 1997 Guidance for the Utilization of M/WBEs, which require that contractors working on a M/WBE job (like SCC) submit reports to the DEP that accurately reflect the value of work by a "certified" M/WBE subcontractor performing a useful business function. [*Id.*, p. 13-14, 26-31 (citing trial exhibits and testimony regarding the inaccuracies of the DEP reports).] Dragados argues that D'Angelo's determination that SCC repeatedly submitted reports to the MTA and DEP on Jobs 506, 510, and 511, counting work for subcontractors that it knew were either not certified or not serving a commercial useful function, demonstrates that SCC's reports were inaccurate and violated the applicable law and Donovan's failure to disclose that information to Dragados constitutes a breach of Section 4.9(a). [*Id.*]

In opposition, Donovan argues that on the eve of trial -- for the first time -- Dragados alleged SCC's noncompliance violated 49 C.F.R. § 26.55, 40 C.F.R. Part 35, New York Executive Law Article 15-a, and the EPA M/WBE Guidance whereas Dragados had previously asserted noncompliance with 49 C.F.R. § 26.55, 40 C.F.R. § 33.503, and New York Executive Law Article 15-a. [Pl.'s Post-Trial Summ., p. 32-33.] Donovan surmises that Dragados's correction of the Title 40 C.F.R. Section reflects its realization that 40 C.F.R. Part 33 was not effective until May 2008. [*Id.*] Donovan alleges the Court should not consider this newly cited law or the EPA Guidance because they were not set forth in the Final Pretrial Order. [*Id.*][16] In response, Dragados argues that it has "consistently alleged that SCC was in violation of these rules by submitting inaccurate M/W/DBE forms to the government." [Defs.' Post-Trial Summ. at 14, n. 9 (citing Tr. Day 3, D'Angelo 55:14-57:13, 90:16-91:13, 92:25-93:8, 99:17-102:2.).] Dragados points out that in 2008, the EPA combined 40 C.F.R. Part 35, its 1997 Guidance, and other relevant rules into one regulation -- 40 C.F.R. Part 33 -- in an effort to streamline its rules, regulations, and guidelines governing the M/WBE program. [*Id.* at 13, n. 8 (citing 73 Fed. Reg. 15904, 15905 (2008) (noting that, prior to 2008, the "EPA's MBE/WBE Program [was being] implemented through [e]xisting MBE and WBE provisions scattered throughout 40 CFR parts 30, 31, 35 and 40 [and] the Agency's 'Guidance for the Utilization of Small, Minority and Women's Business Enterprises in Assistance Agreements.'")).] Therefore, Dragados argues, its reliance on 40 C.F.R. Part 33, passed in 2008, which combined the prior scattered guidance into

---

[16] Donovan also argues that the EPA Guidance is not an applicable law because the SPA does not specifically include agency "guidance" documents in its definition of "Law." [Pl.'s Post-Trial Summ., p. 33 (citing SPA § 1.1).] The Court is satisfied, however, that the EPA document could be considered "law," as it is broadly defined in the SPA as "any law, ordinance, writ, directive, judgment, order, decree, injunction, statute, treaty, rule, regulation, regulatory requirement or determination of a Governmental Authority." [SPA § 1.1.]

one regulation, is therefore irrelevant as the rules were the same while SCC was owned by Donovan, and SCC was not in compliance with them. [*Id.* at 14, n. 9.]

Without commenting on the import of the particular authority Donovan objects to, the Court finds that Donovan has not sufficiently shown how he was prejudiced by Dragados's reliance on this authority. Moreover, the use of the EPA Guidance by Donovan's counsel during depositions in this case, in addition to the legislative history of the authority cited by Dragados, belies his argument that he was unaware of its relevance in this case. [Tr. Day 3, D'Angelo (reading back deposition testimony at 93:3-8; 97:11-6; 101:5-22; 102:20-103:5).]

Donovan also argues that Dragados's "strict liability" approach to showing SCC's noncompliance with the agencies M/W/DBE regulations is simply wrong because these programs depend on flexibility in implementation, good faith efforts to raise participation, and state and agency level discretionary judgment calls. [Pl.'s Post-Trial Summ., p. 34-35, 42-44, 60-61.] In this respect, Donovan contends that D'Angelo's calculation of SCC's noncompliance ignores the flexibility of the M/W/DBE programs by failing to take into consideration subsequent changes or good faith efforts made and disregards the fact that failing to meet the aspirational DBE goals is not a *de facto* violation of the regulations. [*Id.*][17] It necessarily follows, Donovan states, that because Dragados could not prove that SCC failed to undertake good faith efforts to fulfill its participation goals it therefore has failed to prove noncompliance with the law. [*Id.*, p. 49.] Donovan further argues that SCC cannot be deemed to be in material noncompliance with applicable law because the MTA and DEP approved the M/W/DBE participation submitted by SCC on Jobs 506, 510, and 511. [*Id.*, p. 52-55.] According to

---

[17] Donovan also alleges that D'Angelo's testimony may not be relied upon to describe a M/W/DBE program and how it functions because there was not a foundation laid as to her experience with either of the applicable programs. [*Id.*, p. 50-52.]; *see also supra, n.* 10 (foundation of D'Angelo's testimony).

Donovan, the fact "that the agencies reviewed the actual participation, knew of the misreporting because of the corrective letters and, nevertheless, still approved the participation and plans without once asserting that SCC was in non-compliance, demonstrates that the agencies – as the arbiters of compliance – concluded that the incorrect reporting alone was insufficient to constitute non-compliance." [*Id.* p. 54.]

Much of Donovan's good faith position is specious in light of the evidence. As a practical matter, any good faith efforts required by the relevant DBE programs must be viewed in conjunction with the mandates that govern these programs requiring that contractors such as SCC only count participation for certified DBEs performing commercially useful functions. Donovan breached Section 4.9(a) when he represented that SCC complied with all applicable law – as the term is broadly defined in the SPA – despite imputed knowledge to the contrary. Moreover, by acknowledging that corrective letters were filed following the audit, Donovan is conceding that at the time the reports were filed they contained inaccuracies in violation of the "Books and Records" provision of Section 4.9(a) of the SPA.

Donovan contends that even if Dragados were able to introduce competent evidence of miscounting -- sufficient to carry its burden of proof that Donovan breached Section 4.9(a) -- any alleged technical noncompliance was not the cause of SCC's settlement with the government. Fraud and criminal claims were. [Pl.'s Post-Trial Summ., p. 37, 57-58.] In this regard, Donovan argues that in order for Dragados to recover for SCC's settlement under a breach of contract theory, it must prove the settlement of the U.S. Attorney's mail fraud and FCA claims is the natural and probable consequence of the claimed unintentional violations of M/W/DBE regulations. [*Id.*, p. 58 (citing *Donovan v. Bachstadt*, 91 N.J. 434, 444-45 (1982).] Donovan contends that Dragados has failed to make this essential showing because liability under the

criminal mail fraud or FCA statutes cannot be imposed for innocent errors and because the U.S. Attorney's claim involved the use of "fronts," which does not involve the counting of M/W/DBE participation. [*Id.*, p. 59-60.]

As with Sections 4.8(a) and 4.9(c) above, Dragados maintains that attorneys' fees and settlement costs -- incurred in avoiding a criminal indictment -- directly stem from SCC's pre-closing inaccurate M/W/DBE plans and reports which violated the law as is defined in the SPA. [Defs.' Post-Trial Summ., p. 33-34.] The evidence fully supports Dragados on this point. [*See, supra,* Section IIF; Non-Prosecution Agreement; Tr. Day 4, Libassi 58:21-62:18.]

Based on the foregoing, the Court finds that Donovan breached the SPA by representing that SCC was in compliance with all applicable laws in violation of Section 4.9(a) of the SPA. Moreover, the fees and costs incurred in Dragados's negotiations and ultimate settlement with the government were the "natural and probable consequences" of Donovan's misrepresentations. *MacWilliams, supra,* *6 (quoting *Totaro,* 191 N.J. at 13).

## C. Dragados Alleges it is Entitled to Indemnification from Donovan for Damages Incurred in Connection with the Government's Criminal Investigation

### 1. Indemnification Under the SPA

Dragados has consistently argued that as a direct result of Donovan's breach of the SPA's representations, it was forced to hire counsel and negotiate a settlement with the government to avoid a crippling prosecution based on SCC's submission of inaccurate M/W/DBE plans and reports. [Defs.' Post-Trial Summ., p. 32.] Dragados contends that an indictment would have risked the destruction of SCC and injured the entire Dragados family of businesses because SCC would not have been able to bid on any public projects. [*Id.* at 39 (citing Tr. Day 4, Lopez 122:19-123:5; Tr. Day 4, Libassi 81:4-82:8); *see also id.* at 42, n. 17 (citing Tr. Day 4, Lopez 124:7-13).]

Dragados relies on Section 10.1 of the SPA in support of its argument that Donovan is obligated to indemnify it for 100% of any losses caused by his breaches including reasonable attorneys' fees and expenses that were paid by any Parent Indemnified Person, which explicitly includes SCC. [*Id.*, p. 32-34 (citing SPA § 10.1).] Section 10.1(a) provides that Donovan and Schiavone must: "severally and not jointly, indemnify, defend and hold harmless Parent [Dragados], each of its Subsidiaries (including SCC and its Subsidiaries), and each of their respective directors, officers, managers and employees (and the respective heirs, successors and assigns of each of the foregoing) (the "Parent Indemnified Persons") from and against and in respect of one hundred percent (100%) of all Parent Losses." [SPA § 10.1(a).] "Parent Losses" are further defined in the SPA as:

> all actual losses, liabilities, damages, judgments, settlements and expenses (including interest and penalties recovered by a Third Party with respect thereto and reasonable attorneys' fees and expenses and reasonable accountants' fees and expenses incurred in the defense of any of the same or in asserting, preserving or enforcing any of the rights of the Parent Indemnified Persons arising under Articles X and XI) incurred by any of the Parent Indemnified Persons, whether or not involving a Third-Party claim, which are caused by, arise from or are related to: (i) any breach by [Donovan], Schiavone or SCC of any of their respective representations and warranties contained in or made by or pursuant to Article IV . . .

[*Id.* § 1.1.] In accordance with Section 10.1(b), Donovan and Schiavone must also:

> . . . severally and jointly, indemnify, defend and hold harmless the Parent Indemnified Persons from and against and in respect of one hundred percent (100%) of all actual losses, liabilities, damages, settlements and expenses (including interest and penalties recovered by a Third Party with respect thereto and reasonable attorneys' fees and expenses and reasonable accountants' fees and expenses incurred in the defense of any of the same

or in asserting, preserving or enforcing any of the rights of the Parent
Indemnified Persons arising under Article X) incurred by any of the Parent
Indemnified Persons, whether or not involving a Third-Party claim, which
are caused by, arise from or are related to (i) any breach of any
representation or warranty made by SCC, [Donovan] or Schiavone
pursuant to Article IV or Article V, (ii) any covenant of [Donovan] or
Schiavone contained in this Agreement . . . ; provided, however, that, in
the case of any representation or warranty that is limited by "material,"
"Material Adverse Effect" or by any similar term or limitation, the
occurrence of a breach or inaccuracy of such representation or warranty . .
. and the amount of losses subject to indemnification hereunder shall be
determined as if "material," "Material Adverse Effect" or by any similar
term or limitation were not included therein.

[SPA § 10.1(b) (underlining in original).]

Dragados states that the damages here include the $22,370,000 in penalties against SCC,
the more than $3,840,000 in legal and professional fees that Dragados and SCC incurred in
defending against and negotiating the settlement of criminal charges, and the on-going legal and
professional fees incurred in this litigation. [*Id.*, p. 34-35, 44-45.] The SPA makes provision for
paying damages for breach:

first, until the Installment Payment is made by Buyer, offset
against the obligation of Buyer to make payment to such
Shareholder [Donovan] of Shareholder [Donovan's] one-half (1/2)
share of the [$20 million] Installment Payment; and second, if and
only if the claims of the Parent Indemnified Persons are not
satisfied by payment out of or offset against such foregoing
amount to such Shareholder [Donovan] in accordance with the
terms of this Section 10.5, by Shareholder [Donovan] and
Schiavone, severally and not jointly.

[*Id.*, p. 35 (quoting SPA § 10.5).] Based on this provision, Dragados alleges it can offset the first $10,000,000 of its claimed damages against the outstanding $10,000,000 Installment Payment. The amount by which its damages exceed $10,000,000, Dragados argues, must be paid by Donovan. [*Id.*]

Donovan opposes for several procedural and substantive reasons. He claims that indemnification was waived because Dragados failed to give him notice that it would be seeking indemnification for any Parent Losses it incurred as a result of the U.S. Attorney's claim of fraud -- as is required under SPA Section 10.3 and New Jersey law. [Pl.'s Post-Trial Summ., p. 62-71.] He argues this lack of notice deprived him of the opportunity to evaluate the merits of the government's claim and that he was intentionally "kept out" of the settlement negotiations with the government. [*Id.*, p. 68-70.] On this point, Dragados maintains that it gave prompt notice to Donovan in accordance with Section 10.3 in letters dated February 27, 2008, March 6, 2008, and December 15, 2008, which all contain the term "indemnification" in the subject line. [Defs.' Post-Trial Summ., p. 34 (citing Defs.' Exhs. 154, 158, 170).] Additionally, Dragados references earlier court orders that required it to provide Donovan with real-time updates about the status of its negotiations with the government and granted Donovan additional discovery related to the reasonableness of the settlement. [*See* D.E. 100, FPTO at § 2; D.E. 168.] Donovan counters that the letters do not constitute adequate notice because they do not mention the Third Party claim of fraud or criminal mail fraud made by the U.S. Attorney against SCC. [Pl.'s Post-Trial Summ., p. 63-70.] Donovan also argues that despite updates on the status of Dragados's negotiations with the government and its ability to "take some limited depositions" on the reasonableness of the settlement, he was "deprived of discovery," because he "didn't get the documents that [Dragados] claimed are privileged or work product." [Tr. Day 1, Garrod 50:5-52:10.]

Donovan's arguments are unavailing and in certain respects, waste the Court's time. Dragados satisfied the notice provision of Section 10.3 by its letters dated February 27, 2008, March 6, 2008, and December 15, 2008, which articulated its decision to withhold the Installment Payment as an indemnification offset for representations it felt were made by Donovan and its reservation of any and all other rights. [Defs.' Exhs. 154, 158, 170.] The record reveals that Donovan was not left in the dark regarding the status of Dragados's negotiations with the government. Dragados was ordered to— and did— provide Donovan with all communications with the government within 72 hours of receipt or transmittal. [FPTO at § 2; D.E. 168.] Donovan was also permitted sufficient discovery into the reasonableness of the settlement. [*Id.*]

As to Donovan's argument that Dragados waived its indemnification claim, the Court is satisfied that the plain language of the contract makes clear that *any* Parent Indemnified Person, including Dragados and SCC, may recover for any losses including settlements incurred or sustained by *any* Parent Indemnified Person. [*See* SPA §§ 1.1, 10.2; Tr. Day 1, Zalman 36:2-6.] In addition, Dragados is not seeking to recover for the wrongdoing of SCC but rather is seeking to recover for Donovan's breaches of the representations and warranties in the SPA and, as a party to the SPA, it may seek to enforce its terms. [Tr. Day 1, Zalman 37:22-25.] Finally, the Court easily rejects Donovan's argument that Dragados is not entitled to indemnification solely because SCC cut the checks to the government, as it was ultimately Dragados's money that funded the settlement. [*See* Defs.' Response to Pl.'s Damages Motion In Limine, p. 15.]

Donovan also argues that Dragados cannot recover legal or professional fees because the SPA bars indemnification for indirect, consequential, and incidental damages. [Pl.'s Post-Trial Summ., p. 78-82.] But the plain language of SPA – namely, Section 10.1, which governs

Donovan's indemnification obligations under the SPA, and the definition of Parent Losses –
clearly provide that attorneys' fees are recoverable losses by Dragados whether or not involving
a Third Party claim. [*See generally* Defs.' Response to Plf's Damages Motion In Limine, p. 12-
21.]

### 2. Reasonableness of Settlement

Donovan argues that Dragados must show that the settlement amount was reasonable by
providing proofs in support of the U.S. Attorney's claim that SCC committed fraud in its
reporting of M/W/DBE participation on SCC Jobs 502, 506, 510, and 511, or through the use of
expert testimony. [Pl.'s Post-Trial Summ., p. 88-106.]   Donovan asserts that Dragados has done
neither and thus it is not entitled to indemnification under the SPA.  [*Id.*, p. 88-89.]  Specifically,
Donovan argues that testimony elicited from D'Angelo, Libassi, and Lopez was speculative,
incompetent, and not probative of the reasonableness of the settlement, as it did not substantiate
the government's fraud allegations.  [*Id.*, p. 94.]  Donovan contends that the only evidence that
Dragados proffered in support of the U.S. Attorney's case against SCC is the conversation
secretly recorded by Joe Vollaro, which Donovan describes as lacking any indication that SCC
was engaging in a fraudulent scheme.  [*Id.,* p. 100-101.]  Beyond that, Donovan continues, the
record lacks any evidence that would support the U.S. Attorney's fraud claim and further reveals
that Dragados failed to mount any substantial challenge to the government's claims. [*Id.*, p. 101.]

In response, Dragados contends that the reasonableness of the settlement with the
government is apparent from the facts adduced at trial.   [Defs.' Post-Trial Summ., p. 36-44.]
Those facts include:

- the broad scope of the 2008 Search Warrants and Subpoenas
  executed at two SCC sites by agents from at least five different
  government agencies;

- representations made by the U.S. Attorney's Office regarding its strong evidence, including secretly recorded statements, in support of its allegation that SCC's miscounting of M/W/DBE participation credit amounted a host of different charges against SCC including indictable fraud and/or RICO and False Claims Act violations;

- AUSA Brownell's representation that the government was looking for between $25,000,000 and $30,000,000 to resolve the matter;

- AUSA Hayes's representation that a settlement of the FCA case would amount to between $62,500,000 and $75,000,000;

- Schumacher's representation that SCC would likely be subjected to a debarment hearing;

- SCC's inability to bid on projects once an indictment was issued; and

- the adverse effect an indictment would have on Dragados-related entities doing business in the United States as Dragados is the construction arm of ACS – a public company in Spain with a number of subsidiaries that wanted to get involved in bidding projects in the United States.

[*Id.*, p. 32, n.14, 36-43 (citing 2008 Search Warrants & Subpoenas; Tr. Day 4, Libassi 58:21-64:1, 68:20-69:21, 71:5-72:2, 73:4-74:1; 77:10-80:21, 81:4-84:11; Tr. Day 4, Lopez 119:18-120:19, 121:11-17, 122:19-123:5, 124:3-4, 124:7-17, 156:7-10).] The Court finds that Dragados has marshaled convincing proofs about the strength of the government's case, the effect of that case going forward, and the basis for the financial calculations to support fully the reasonableness of the settlement reached between SCC and the authorities.

Finally, Donovan continues to assert an estoppel argument in his post-trial arguments, as he has in his pre-trial submissions, to this effect: the millions that Dragados paid the government were based on admissions of mail fraud, yet Dragados has been steadfast that its lawsuit against Donovan is not based on fraud. [Pl.'s Post-Trial Summ., p. 106-115; Tr. Day 1, Garrod 25:21-

26:7, 47:4-9; D.E. 211-2 (Pl.'s Pretrial Mot. to Strike Damages) at 29-36.] Hence, according to Donovan, the claim for $22,370,000 is barred. On this point, the Court agrees with Dragados that it need not establish that SCC actually committed mail fraud; rather, as case law provides, it only needs to establish that Donovan breached the representations in the SPA, that those breaches injured Dragados, and that those injuries were the natural and probable result of the breach. [Defs.' Post-Trial Summ., p. 31-32 (citing *Totaro, supra,* 191 N.J. at 13 and *Caro Assocs. II, LLC v. Best Buy Co.*, No. 09-907, 2012 WL 762304 (D.N.J. March 6, 2012)).] Dragados maintains that Donovan breached certain representations that caused it to incur millions of dollars in damages because all of the alleged criminal violations set forth by the U.S. Attorney's office stemmed from SCC's submission of false M/W/DBE reports to the government. [*Id.* at 33-34; Tr. Day 1, Zalman 33:25-34:15, 37:22-25, 42:14-43:15; D.E. 215 (Defs.' Opp. to Pretrial Mot. to Strike Damages) at 17-18.] Indeed, the civil forfeiture complaint specifically referenced Jobs 506, 510 and 511, and set forth that SCC engaged in a scheme to defraud the government by submitting false M/W/DBE reports in violation of 49 C.F.R. Part 26 and New York Executive Law Article 15-a. [*Id.*, p. 41 (citing Defs.' Exh. 408 ("Civil Forfeiture Complaint"); Tr. Day 4, Libassi 90:9-91:16.] In addition, Job 510 was the subject of the 2007 Subpoena that Donovan failed to mention in the Disclosure Letter. [*Id.* (citing 2007 Subpoena; Civil Forfeiture Complaint; Tr. Day 4, Libassi 91:17-21).]

## V.   CONCLUSION

Because there is a direct connection between Donovan's breaches of the SPA and the ultimate settlement of criminal charges with the government, Dragados is entitled to recover the $22,370,000 million payment to the government. [Defs.' Post-Trial Summ., p. 44-45.] In accordance with the express terms of the SPA, the Court is satisfied that Dragados is entitled to

offset the first $10,000,000 of this damage amount against the outstanding $10,000,000 Installment Payment owed to Donovan. [SPA § 10.5.][18] Section 10.5 of the SPA also compels Dragados to divide the remaining $12,370,000 in half as all damages in excess of the Installment Payment are to be offset by Donovan and Schiavone "severally and not jointly." [*Id.*] The SPA also requires that the remaining $6,185,000 in damages owed to Dragados be reduced by Donovan's portion of the pre-closing tax refunds withheld by Dragados -- $442,346 plus interest accruing from ten business days after receipt of such refunds. [*Id.* at § 11.5.]

Dragados contends that the SPA also allows recovery of attorneys' fees incurred in defending against- and ultimately settling- the criminal charges against SCC, and the fees incurred in connection with the present litigation. [Defs.' Post-Trial Summ., p. at 45; *see also id.* at 34 (quoting SPA § 10.1).] The Court is satisfied that the indemnification provision of the SPA contemplates recovery of both sets of fees and expenses and appoints Hon. John E. Keefe, Sr. (ret.) to serve as Special Master for the purposes of determining the attorneys' fees and costs incurred by Dragados. Judge Keefe will also determine the appropriate interest attributable to Donovan's half of the pre-closing tax refund for the purposes of offsetting the total damages owed to Dragados. The parties shall share equally the costs and expenses associated with the Special Master's services, with final allocation to be determined by the Court upon recommendation of the Special Master.

The parties shall make arrangements with Judge Keefe's office to have a teleconference with him no later than 20 days after the filing of this opinion. The Court will enter such orders

---

[18] Section 10.5 of the SPA, which dictates how indemnification obligations should be satisfied, states that the amount owed by Donovan under Article X is first to be offset by his "one-half (1/2) share of the Installment Payment." The provision later states that interest on the Installment Payment is appropriate only if it is later determined that Dragados was not entitled to such indemnification. As such, Donovan is not entitled to offset the interest attributable to his portion of the Installment Payment.

as are necessary to effectuate his requirements regarding submissions, their contents and length, and the briefing and hearing schedule he and the parties agree upon. The Court further directs that Judge Keefe shall have the discretion to hold a plenary hearing on discrete issues that he may identify. Judge Keefe's final Report and Recommendations shall be filed no later than 60 days after his teleconference with the parties. This deadline may be extended for good cause with the consent of the parties.

Date: June 28, 2013                              /s/ Katharine S. Hayden
                                                 Katharine S. Hayden, U.S.D.J.