**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

RAYMOND J. DONOVAN,

       *Plaintiff*,

v.

DRAGADOS, S.A., DRAGADOS
INVERSIONES USA, S.L., and NEWARK
REAL ESTATE HOLDINGS, INC.,

       *Defendants*.

Civil Action No. 09-409 (KSH)

**OPINION**

**Katharine S. Hayden, U.S.D.J.**

      Following a bench trial in this matter, the Court filed its opinion on June 28, 2013 finding that Dragados is entitled to recover the $22.37 million payment made to the government to resolve the criminal investigation of its wholly-owned subsidiary Schiavone Construction Company ("SCC"), which it had acquired from plaintiff Raymond Donovan and his partner Ronald Schiavone.   [D.E. 249.]   Both parties now seek reconsideration of the Court's computation of damages.   [D.E. 250, 251.]   Dragados requests that the Court reconsider its damage award to account for its pre-trial settlement with Donovan's partner Schiavone – to avoid double recovery.   [D.E. 250.]   Donovan seeks relief under Fed. R. Civ. P. 52(b) and 60(a) arguing that the maximum amount for which he can be held liable is 50% of the $22.37 million in damages; that the amount of the installment payment offset should be $10.7 million, rather than $10 million; and that he is entitled to a credit for the tax benefit, if any, received by Dragados as a result of having paid the government $22.37 million.   [D.E. 251.]

## I.   **BACKGROUND**

In December 2007, Dragados purchased SCC from Donovan and Schiavone for $150 million.  Under the operative Stock Purchase Agreement ("SPA") Donovan and Schiavone fully divested themselves of their equal shares of SCC stock and Dragados paid each of them $65 million at closing and owed each a final installment payment of $10 million payable one year after the closing. [D.E. 249 ("Bench Opinion") at 1.] Less than two months after Dragados purchased SCC, federal agents raided the corporate office.  Over the next months, Dragados responded to requests for production of documents, provided witnesses for government interviews, and ultimately, in December 2010, entered into a non-prosecution agreement with the U.S. Attorney for the Eastern District of New York.  [*Id.*]  The investigation and subsequent government settlement related to SCC's use and accounting of Minority, Woman, and Disadvantaged Business Enterprises ("M/W/DBEs") for specific construction projects performed for the MTA and DEP. [*Id.* at 10, 12.]

After SCC's offices were raided, Dragados informed Donovan and Schiavone that it would not being making the scheduled installment payments because it was seeking indemnification under SPA Sections 10.1(a) and 10.1(b) for losses arising from the investigations by several government agencies.  [*Id.* at 27 (citing "Indemnification Notices").] Dragados indicated that it was entitled to use the $20 million it retained to offset these losses under Section 10.5 of the SPA because Donovan and Schiavone breached representations made in Sections 4.8(a), 4.9(a), and 4.9(c) of the SPA.  [*Id.*][1]

---

[1] In Section 4.8(a) of the SPA, Donovan and Schiavone represented and warranted to Dragados that: "Except as set forth in Section 4.8(a) of the Disclosure Letter . . . no material investigation or inquiry by or before any Governmental Authority is pending or, to the Knowledge of SCC, threatened against SCC."  [SPA § 4.8(a).]  Under Section 4.9(c), the partners further represented that: "Except as set forth in Section 4.9(c) of the Disclosure Letter . . . none of SCC . . . has

After Dragados failed to make the installment payments and withheld pre-closing tax payments, Donovan and Schiavone filed separate breach of contract suits against Dragados. [*Id.* at 2; D.E. 1; D.E. 19-4.] Dragados filed an answer and counterclaim in each of the actions alleging that Donovan and Schiavone materially breached representations and warranties in the SPA. The actions were consolidated, discovery went forward, and the parties engaged in dispositive motion practice.

Pertinent to these reconsideration motions, on the first day of trial Schiavone and Dragados stipulated to the dismissal of all pending claims based on a settlement that had been reached the week before. [D.E. 229, 239.] Donovan subpoenaed a copy of the settlement agreement. Schiavone moved to quash the subpoena alleging that confidentiality of the settlement terms was a bargained-for condition of the settlement. [D.E. 232; *see also* Tr. Day 1, Taylor 54:16-20; *id.* Kinzler 55:16-19.] Agreeing with the settling parties' application, the Court quashed the subpoena. Because the motion was heard before trial even began, the Court also stated that Donovan's concerns regarding the effect, if any, of the Schiavone settlement on his case would be addressed at the appropriate time. [Tr. Day 1 55:2-56:6.]

The bench trial between Donovan and Dragados went forward and at the conclusion of trial, both parties filed written summations. [D.E. 235, 240-242, 244-246.] Based on the witness

---

received any written notice from any Government Authority that, or otherwise has any Knowledge that [ ] alleges any material noncompliance (or that SCC . . . is under investigation or the subject of an inquiry by any such Governmental Authority for such alleged noncompliance) with any applicable Law . . ." [*Id.* § 4.9(c).] Finally, under Section 4.9(a), the partners represented that: "SCC, each of its Subsidiaries, PPR and the Shareholders . . . are, and have been at all times, in compliance in all material respects with all applicable Laws." [*Id.* § 4.9(a)] In that subsection, Donovan also represented that "[a]ll Books and Records . . . of SCC and its Subsidiaries have been maintained, in all material respects, accurately and in accordance with applicable Law." [*Id.*] "Books and Records" are defined in the SPA as "compliance records, . . . and other materials prepared for or filed with Governmental Authorities regulating the businesses of SCC and its Subsidiaries . . ." [*Id.* § 1.1.]

testimony, trial exhibits, and parties' summation briefs, the Court found that Donovan breached

the representations made in Sections 4.8(a), 4.9(a), and 4.9(c) of the SPA by failing to disclose:

(1) the government's investigation of SCC; (2) that SCC had submitted inaccurate reports to the

MTA and DEP in violation of the law -- as defined in the SPA; and (3) that SCC's Books and

Records were inaccurate because, at a minimum, they overstated credits for M/W/DBE

participation. [Bench Opinion at 29-39.] In light of these findings, the Court calculated

Dragados's damages as follows:

> Because there is a direct connection between Donovan's breaches of the SPA and
> the ultimate settlement of criminal charges with the government, Dragados is
> entitled to recover the $22,370,000 payment to the government. [Defs.' Post-
> Trial Summ., p. 44-45.] In accordance with the express terms of the SPA, the
> Court is satisfied that Dragados is entitled to offset the first $10,000,000 of this
> damage amount against the outstanding $10,000,000 Installment Payment owed
> to Donovan. [SPA § 10.5.][18]
>
>> [FN. 18] Section 10.5 of the SPA, which dictates how
>> indemnification obligations should be satisfied, states that the
>> amount owed by Donovan under Article X is first to be offset by
>> his "one-half (1/2) share of the Installment Payment." The
>> provision later states that interest on the Installment Payment is
>> appropriate only if it is later determined that Dragados was not
>> entitled to such indemnification. As such, Donovan is not entitled
>> to offset the interest attributable to his portion of the Installment
>> Payment.
>
> Section 10.5 of the SPA also compels Dragados to divide the remaining
> $12,370,000 in half as all damages in excess of the Installment Payment are to be
> offset by Donovan and Schiavone "severally and not jointly." [Id.] The SPA also
> requires that the remaining $6,185,000 in damages owed to Dragados be reduced
> by Donovan's portion of the pre-closing tax refunds withheld by Dragados --
> $442,346 plus interest accruing from ten business days after receipt of such
> refunds. [Id. at § 11.5]
>
> Dragados contends that the SPA also allows recovery of attorneys' fees incurred
> in defending against- and ultimately settling- the criminal charges against SCC,
> and the fees incurred in connection with the present litigation. [Defs.' Post-Trial
> Summ., at p. 45; see also id. at p. 34 (quoting SPA § 10.1).] The Court is
> satisfied that the indemnification provision of the SPA contemplates recovery of
> both sets of fees and expenses and appoints Hon. John E. Keefe, Sr. (ret.) to serve

as Special Master for the purposes of determining the attorneys' fees and costs incurred by Dragados. Judge Keefe will also determine the appropriate interest attributable to Donovan's half of the pre-closing tax refund for the purposes of offsetting the total damages owed to Dragados. The parties shall share equally the costs and expenses associated with the Special Master's services, with final allocation to be determined by the Court upon recommendation of the Special Master.

[*Id.* at 46-47.]

Dragados seeks reconsideration of this damage computation to account for its settlement with Schiavone to avoid double recovery while Donovan moves for an order amending the Court's award to Dragados from $6,185,000 to $42,654. Donovan also asks that the Court amend its order appointing the Special Master to include a calculation of credit against the damages for any tax benefit Dragados may have realized as a result of its $22.37 million settlement.

## II.   GOVERNING STANDARDS

### A.  Reconsideration Standard Under L. Civ. R. 7.1(i)

In accordance with L. Civ. R. 7.1(i), Dragados seeks reconsideration of the Court's damages computation. [D.E. 250 ("Recon. Br.").] "[A] party seeking reconsideration must satisfy a high burden, and must 'rely on one of three major grounds: (1) an intervening change in controlling law; (2) the availability of new evidence not available previously; or (3) the need to correct clear error of law or prevent manifest injustice.'" *Leja v. Schmidt Mfg., Inc.*, 743 F. Supp. 2d 444, 456 (D.N.J. 2010) (Debevoise, J.) (quoting *N. River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)); *see also Connolly v. Mitsui O.S.K Lines, Inc.*, No. 04-5127, 2010 WL 715775, at *1 (D.N.J. Mar. 1, 2010) (Linares, J.) (same). The moving party must set forth the factual matters or controlling legal authorities it believes the court overlooked in reaching its initial decision. "Whether to grant a motion for reconsideration is a matter within

the Court's discretion." *Francis v. Joint Force Headquarters Nat'l Guard*, No. 05-4882, 2009 WL 90396, at *5 (D.N.J. Jan. 12, 2009) (Simandle, J.).

Dragados's request for leave to file a short reply brief under L. Civ. R. 7.1(d)(3) to address arguments made by Donovan for the first time in his opposition papers is granted.  [D.E. 260.]  Donovan's contention that reply briefs in furtherance of motions for reconsideration are expressly prohibited by L. Civ. R. 7.1(d)(3) [D.E. 261] is incorrect.  Reply briefs may be permitted where, as here, the movant seeks leave to respond "to arguments raised in the opposition brief, or explain a position in the initial brief that the respondent refuted." *Smithkline Beecham PLC v. Teva Pharm. USA, Inc.*, No. 04-0215, 2007 WL 1827208, at *1 (D.N.J. June 22, 2007) (Hillman, J.); *see also Kleinberg v. Clements*, No. 09-4924, 2012 WL 1019290, at *9 (D.N.J. Mar. 3, 2012) (Hillman, J.) (same).  Donovan's request to file a sur-reply [D.E. 261] is denied because Dragados's reply brief does not raise any new arguments but rather responds to arguments made by Donovan for the first time in his opposition papers.

**B.  Amendment or Modification Standard Under Fed. R. Civ. P. 52(b) & 60(a)**

Donovan moves for new findings under Fed. R. Civ. P. 52(b).  Under Rule 52(b), "the court may amend its findings [after a bench trial] – or make additional findings – and may amend the judgment accordingly."  The Third Circuit has stated that this rule allows "the court to correct plain errors of law or fact, or, in limited situations, allows the parties to present newly discovered evidence." *Moss v. Potter,* No. 07–2779, 2007 WL 2900551, at *2 n.2 (3d Cir. 2007) (per curiam); *see also Fletcher v. St. Joseph Reg'l Med. Ctr.*, No. 10-1499, 2013 WL 3146879 (D.N.J. June 19, 2013) (Linares, J.) (same) (citing *Moss*).

Donovan has also moved to correct the Court's computation of damages under Fed. R. Civ. P. 60(a), which allows the court to "correct a clerical mistake or a mistake arising from

oversight or omission whenever one is found in a judgment, order, or other part of the record." The Third Circuit has indicated that this Rule "is limited to the correction of clerical mistakes; it encompasses only errors mechanical in nature, apparent on the record, and not involving an error of substantive judgment." *Pfizer Inc. v. Uprichard*, 422 F.3d 124, 129-130 (3d Cir. 2005) (quotations omitted); *see also In re Diet Drugs Prods. Liab. Litig.*, 200 F. App'x 95, 103-104 (3d Cir. 2006) (same).

## III.   DISCUSSION & ANALYSIS

### A.  Donovan's Liability & the Effect of the Schiavone Settlement

#### 1.  *Schiavone Settlement*

In its motion for reconsideration, Dragados discloses that it "paid Schiavone $1.6 million, and Schiavone released Dragados from, *inter alia,* any obligation to pay the remaining $8.4 million of Schiavone's portion of the Installment Payment." [Recon. Br. at 4; *see also* Settlement Agreement, attached as Exh. A to D.E. 260 ("Drag. Reply Br.").]  Valuing its settlement with Schiavone at $8.4 million, Dragados argues that to avoid double recovery, the Court should amend the judgment "to direct Donovan to pay [ ] $3.97 million in damages, rather than [ ] $6.185." [Recon. Br. at 1-2, 5-6.]

In response, Donovan alleges that Dragados incorrectly values the settlement because it does not take into account the correct dollar amount of Schiavone's claims. [D.E. 256 ("Recon. Opp. Br.") at 2-4, 13.]  Indeed, Donovan argues that "[b]ased upon the claims pled by Schiavone's complaint for the Installment Payment ($10,700,000), interest on the Installment Payment ($3,058,416) and SCC's tax refunds with interest ($568,783), Schiavone's claims (exclusive of attorney's fees) settled by Dragados pursuant to their confidential settlement agreement totaled **__$14,327,199__**." [*Id.* at 4, 14 (bold and underline in original).]  It follows,

Donovan argues, that in light of the $1.6 million remittance, the benefit received by Dragados is actually $12,727,199.  [*Id.*]²

Responding to Donovan's valuation of the Schiavone settlement, Dragados points out that "[i]n essence, Donovan argues that this Court should proceed as if Schiavone had succeeded on all of his claims, and Dragados failed on its counterclaim."  [Drag. Reply Br. at 2.]  Dragados adds that while the Court should not engage in speculation, Donovan's theory contradicts reality because:

> the only logical outcome is that Schiavone would have lost his claim and Dragados would have succeeded on its counterclaim. That is the obviously conclusion because the Court specifically found in the Donovan case that Dragados properly offset the Installment Payment.  Under the SPA, Schiavone made the same representations to Dragados that the Court determined were breached.  Thus, to suggest, as Donovan's theory does, that the Schiavone case would have ended differently, is absurd.

[*Id.* at 2-3.]

### 2.  Donovan's Liability

Donovan and Schiavone jointly and severally made representations and warranties regarding SCC to Dragados under Title IV of the SPA. [SPA at p. 11 (Preamble to Title IV).] Later, in Sections 10.1(a) and (b) of the SPA, Donovan and Schiavone agreed "severally and not jointly, . . . to indemnify [Dragados] . . . from and against and in respect of one hundred (100%) of all Parent Losses," and "one hundred percent (100%) of all actual losses, liabilities, damages, judgments, settlements and expenses . . . incurred by [Dragados] . . . related to (i) any breach of

---

² With this in mind, Donovan contends that even if he were 100% liable for the damages, if the Court uses his valuation of the Schiavone settlement ($12,727,199), it would result in a $1,499,545 *credit* to Donovan subject to interest on the tax refund and attorneys' fee award. [Recon. Opp. Br. at 15.]  Donovan calculates this "credit" as follows: $22,370,000 (damage award) ‑ $12,727,199 (Donovan's valuation of Schiavone settlement) ‑ $10,700,000 ("Installment Payment offset") ‑ $442,346 (tax credit offset) = ‑ $ 1,499,545. [*Id.*]

any representation or warranty made by [Donovan or Schiavone] pursuant to Article IV or V" of the SPA. [*Id.* at § 10.1(a)-(b).] Finally, Section 10.5, which dictates how indemnification obligations should be satisfied, makes clear that if Dragados's losses are not satisfied by the Installment Payment, they are to be satisfied by Donovan and Schiavone "severally and not jointly." [*Id.* at § 10.5(a).]

After trial, the Court found that "[b]ecause there is a direct connection between Donovan's breaches of the SPA and the ultimate settlement of criminal charges with the government, Dragados is entitled to recover the $22.37 million payment to the government." [Bench Opinion at 46.]   Recognizing that Article X governs indemnification, the Court mechanically applied the formula for satisfying indemnification obligations enumerated in Section 10.5 of the SPA.  After offsetting the first $10 million of Dragados's damages against the outstanding $10 million installment payment owed to Donovan, the Court interpreted the second step of 10.5, which provides that the balance of the damages are to be satisfied "by [Donovan] and Schiavone, severally and not jointly," to mean that Donovan is responsible for $6.185 million (*i.e.*, half of the balance of Dragados's damages above the installment offset). [*Id.* at 47 (citing SPA § 10.5).]

Donovan and Dragados both ask the Court to amend its opinion in light of their respective positions on Donovan's liability under the SPA.

Dragados argues that the Court's decision to split the $12.37 million in damages above the Installment Payment offset "misconstrues the meaning of the 'several and not joint' language" because Article X "does not limit Donovan's liability to one half of the damages that he causes by breaching a representation that he made."  [D.E. 257 ("Drag. Opp. Br.") at 13.] Dragados interprets the "joint and several" liability provisions of Sections 4.8 and 4.9 as making

Donovan responsible for his own conduct as well as Schiavone's conduct, "even if Donovan had done nothing that constituted a breach." [Drag. Opp. Br. at 6; Recon. Br. at 6-7 (citing SPA, Art. IV).][3]  Dragados argues that "[t]he SPA also makes clear that in the event that both Schiavone and Donovan make a representation to Dragados, the fact that both have made the same representation does not limit each one's liability to fifty percent of the damages flowing from the breach."  [*Id.* at 7 (quoting Section 10.1(b), which requires Donovan and Schiavone to "severally and not jointly, indemnify" Dragados "from and against and in respect of one hundred percent (100%) of all actual losses, liability [and] damages . . . which are caused by, arise from or are related to [ ] any breach of any representation made . . . pursuant to Article IV or Article V.").][4] Dragados contends "each is responsible for one hundred percent of the damages flowing from a breach of that representation," with the caveat that Dragados cannot recover more than its actual loss.  [*Id.*; *see also* Drag. Opp. Br. at 14; Reply Br. at 1, 5, 6 (citing Restatement (Second) of Contracts § 289 (1981) ("Where two or more parties to a contract promise the same performance to the same promisee, each is bound for the whole performance thereof, whether his duty is joint, several, or joint and several.").]  However, Dragados states that this argument is academic because after factoring in the $8.4 million in value it received from Schiavone, Donovan is only required to pay it $3.97 million. [*See supra* Section III(A)(1); Recon. Br. at 2, 8.]

_____

[3] Because the knowledge of members of SCC, including Donovan and Schiavone, is imputed to Donovan and Schiavone for the purposes of representations made in Sections 4.8(a) and 4.9(c), the Court cannot imagine a scenario where Schiavone could be found to have breached Sections 4.8(a) and 4.9(c) and "Donovan had done nothing that constituted a breach."

[4] Dragados reasons that "[b]ecause the indemnification requirement in Article X applies to breaches of both Article IV and V representations, the language of Article X needs to accommodate two alternative situations – one where damages flow from the breach of an Article IV representation that Donovan and Schiavone each made together and individually, *i.e.* 'jointly and severally,' and alternatively, one where damages flow from the breach of an Article V representation that Donovan and Schiavone each made only individually, *i.e.* 'severally but not jointly.'" [Drag. Opp. Br. at 8; Recon. Br. at 3.]

In response, Donovan argues that he should only be responsible for 50% of Dragados's $22.37 million damages because despite making the Article IV representations with Schiavone jointly and severally, Section 10.1(a) "states that Donovan is only 'severally and not jointly' liable for Dragados's damages, with the Schiavone plaintiffs separately liable for a one-half proportionate share of any damages."   [D.E. 251 ("Don. Moving Br.") at 1, 6 (citing SPA § 10.1); Recon. Opp. Br. at 9.][5]   Therefore, Donovan argues that because he is only liable for 50% of Dragados's damages there should be "a 50% reduction of the $22.37 million of damages **before** deducting [his] one-half share of the Installment Payment and tax credits": $22.37 million (damage award) - $11.185 million (50% of damage award) - $10.7 million (his "Installment Payment offset") - $442,346 (tax credit offset) for a total liability figure of $42,654 minus interest on tax credits determined by Special Master Keefe. [Recon. Opp. Br. at 10-11; Don. Moving Br. at 1-2, 10.]

The Court recognizes that "[i]n aid of interpretation, [it] should consider . . . 'the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct.'"  *Mylan Inc. v. SmithKline Beecham Corp.*, No. 12-1539, 2013 WL 3780163, at *4 (3d Cir. July 22, 2013) (quoting *Kearny PBA Local No. 21 v. Town of Kearny*, 81

---

[5] Donovan also argues that he should only be responsible for 50% of the damage award because Dragados "released 50% of its damages claim" when it settled with Schiavone, therefore, it only "proceeded to a bench trial on the remaining 50% of its damages."  [Don. Moving Br. at 1.]  In support of this claim, Donovan states that "[d]uring oral argument on the motion to quash, the Court recognized that Dragados could not recover from Donovan any part of the 50% of damages for which Schiavone is liable, as it cannot recover more than 50% of its damages from Donovan after it settled with Schiavone and released half of its damage claim."  [*Id.* at 7.]  Donovan's recitation of the record is disingenuous.  From the transcript cited in Donovan's brief it is clear that the Court understood Donovan's concern but was unwilling to address his argument before trial and acknowledged at that time only that Dragados cannot get paid twice – *i.e.*, double recovery.  [*See* Tr. Day 1 54:25-56:7.]

N.J. 208 (1979)); *see also Newark Publishers' Ass'n v. Newark Typographical*, 22 N.J. 419, 426 (1956) (stating that "[w]ords and phrases are not to be isolated but related to the context and the contractual scheme as a whole, and given the meaning that comports with the [parties'] probable intent and purpose," and finding that "[d]isproportionate emphasis upon . . . a single provision does not serve the purpose of interpretation.").

The Court spent considerable time hearing testimony about the context in which the SPA arose.  Without question, the terms of the SPA were the product of careful lawyering by the representatives of very sophisticated parties.  Significantly, when they executed the SPA, both Donovan and Schiavone each contributed 50%, or $10 million each, into an agreed-upon fund of $20,000,000, referred to as the "Installment Payment," that would be used to offset against any losses incurred by Dragados as a result of its acquisition of SCC. [*See* SPA § 10.5.][6] Dragados acknowledges that "[l]ike Donovan, Schiavone had sued Dragados to recover his $10 million Installment Payment," and thereafter "Dragados asserted exactly the same counterclaims against Schiavone that it asserted against Donovan, *i.e.,* that Schiavone breached the Article IV representation in the SPA." [Recon. Br. at 4.]  Moreover, Dragados's counterclaims against both partners conceded that its losses were to be offset in accordance with Section 10.5.  [*See* D.E. 19-5 (Dragados's Counterclaim against Schiavone) at ¶ 126; D.E. 19-6 (Dragados's Counterclaim against Donovan) at ¶ 100 ("On December 15, 2008, Dragados and Inversiones sent Schiavone/Donovan a final letter informing him again that they were seeking indemnification from the Former Shareholders and that Inversiones 'will not make any Installment Payment or

---

[6] Dragados must look to satisfy its damages: "first, until the Installment Payment is made by Buyer [Dragados], by offset against the obligation of Buyer to make payment to such Shareholder of such Shareholder's one-half (1/2) share of the Installment Payment; and second, if and only if the claims of Parent Indemnification Persons are not satisfied by payment out of or offset against such foregoing amount to such Shareholder in accordance with the terms of this Section 10.5, by the Shareholders and Schiavone, severally and not jointly." [SPA § 10.5.]

payment for any credit balance for Pre-Closing Tax Periods so as to preserve its right of offset under Section 10.5 of the Agreement.'")].

Because the representations made in Title IV were made by Donovan and Schiavone jointly, with knowledge imputed to both partners,[7] it is clear that the intent of the parties was that should Dragados incur a loss as a result of a joint misrepresentation, the Installment Payment ($20 million) was there to offset against the loss and then Donovan and Schiavone would split equally the responsibility for any losses over the $20 million.  Or, if Dragados's losses arising from an Article IV breach were under $20 million, the partners would get 50% of anything left of the Installment Payment.  For example, if Dragados's settlement with the government had been for $15 million, Donovan and Schiavone would each get $2.5 million of their portion of the Installment Payment back.

The anomaly here is that Dragados settled with Schiavone and remitted $1.6 million to his estate.  Dragados agreed, in effect, to take less than Schiavone's portion of the Installment Payment and none of the amount of its losses over the Installment Payment. [*See* Recon. Br. at 4 ("Dragados paid Schiavone $1.6 million, and Schiavone released Dragados from, *inter alia,* any obligation to pay the remaining $8.4 million of Schiavone's portion of the Installment Payment.")]  Applying the Section 10.5 formula to calculate Donovan's obligations so that more than his $10 million portion of the Installment Payment is imputed as an offset would result in

---

[7] As stated in the bench opinion, "Donovan and Schiavone's representations and warranties were 'made on the basis of SCC's Knowledge,'" which is defined in the SPA as the knowledge of people enumerated in Exhibit B to the SPA. Exhibit B lists Schiavone and Donovan along with other members of SCC's Executive Committee.  [Bench Opinion at 5 (quoting SPA Preamble to Art. IV and § 1.1).]  Finding that Donovan breached the representations made in Sections 4.8(a), 4.9(a), and 4.9(c), the Court relied on trial testimony and exhibits establishing that members of SCC's Executive Committee – whose knowledge is binding on Donovan and Schiavone – were fully aware of the investigation and SCC's submission of inaccurate M/W/DBE reports. [*See, e.g., id.* at 32, 34, 38.]

Donovan's absorbing an extra $1.6 million in the fund as his responsibility, when the terms of the SPA allocated each partner as equally contributing to the $20 million that Dragados could use to offset any losses, just as the SPA required each to contribute 50% toward any losses above the $20 million.  Dragados may not go beyond the SPA's clear and bargained for terms, by relying on Sections 289 and 294 of the Restatement (Second) of Contracts along with broad recitations of contract law with the aim of getting back from Donovan what it did not get from Schiavone.  It is impossible to interpret the SPA as putting either Donovan or Schiavone in the position of funding the other's portion of the Installment Payment *plus* the other's portion of any losses above the Installment Payment for a loss arising out of a joint representation.[8]

Based on the foregoing, the Court revisits the damage award imposed against Donovan and finds that the SPA dictates that he be liable for his one-half share of all losses *above* the Installment Payment.  Therefore, Donovan is liable for $1.185 million ($22.37 million - $20 million = $2.37 million / 2) plus one-half of the attorneys' fee award related to the government investigation, and all of the attorneys' fees incurred in proceeding to trial.  This amount is to be offset by Donovan's portion of the pre-closing tax credits ($442,346) plus interest.

### B.  Interest on Installment Payment

Donovan argues that the Court committed a "clear error of law under Rule 52(b) and a computational mistake under Rule 60(a)" when it offset Dragados's damages by $10 million for the installment payment instead of $10.7 million.  Relying on Section 2.2 of the SPA, Donovan claims that he is entitled to an additional $700,000 offset representing 7% interest on his portion of the withheld installment payment from the closing date to the one-year anniversary of the SPA

---

[8] The SPA is shot through with language that limits each Shareholder's exposure to 50% of any liability unless the liability is the result of problems with the Shareholder's own shares.  [*See, e.g.,* Article V.]

closing.  [Don. Moving Br. at 2, 24-27.]  In response, Dragados argues that under New Jersey

contract law, Donovan was not entitled to enforce the SPA terms for his own benefit once he

breached his own contractual obligations.  [Drag. Opp. Br. at 18 (citing *Nolan v. Lee Ho*, 120

N.J. 465, 472 (1990) (citing *Stamato & Co v. Borough of Lodi*, 4 N.J. 14 (1950)).]

In accordance with Section 2.2(iii) of the SPA, the "Installment Payment" equals $20

million due on the one-year anniversary of the closing date (December 27, 2008) "together with

interest at a rate of seven percent (7.00%) per annum . . ."  After trial, the Court was satisfied

that the representations in Article IV were breached at the time that the parties signed the SPA

because Dragados was not aware of: (1) the government's investigation of SCC; (2) that SCC

had submitted inaccurate reports to the MTA and DEP; and (3) that SCC's Books and Records

were inaccurate in violation of Sections 4.8(a), 4.9(a), and 4.9(c). [Bench Opinion 31-32, 34, 39.]

Because Donovan breached the SPA before any interest accrued, he is not entitled to an offset of

the damages award to account for interest on the withheld installment payment.  Section 10.5

was written to protect Dragados; it makes no sense to diminish the protection offered by the

withheld funds when Dragados's injury resulted from misrepresentations made by Donovan on

the closing date.

### C.  Credit for Tax Benefit

Donovan also argues that he is entitled to credit under Section 10.7(b) of the SPA for any

tax benefit realized by Dragados as a result of its settlement with the government, and requests

that the amount be calculated by the Special Master.  [Don. Moving Br. at 28-29.]  In this regard,

he alleges that Section 10.7(b) of the SPA "is a not-uncommon tax benefits provision, which

provides that Dragados has an affirmative obligation to come forward with evidence showing

that either Dragados or SCC did or did not realize tax benefits as a result of indemnified Parent

Losses." [D.E. 258 ("Don. Reply Br.") at 14.] For its part, Dragados points out that during the

trial its President Jose Antonio Lopez-Monis Plaza testified:

> **Q:** Do you know whether Dragados or Schiavone Company received any tax benefits from the monies paid to either the U.S. government or to any of the MTA or DEP offices of Investigation?
>
> **A:** I don't know for sure but I believe we didn't.

[Drag. Opp. Br. at 19-20 (citing Tr. Day 4, Garrod/Lopez 163:24-164:3).] Donovan contends that

this testimony "was inadmissible hearsay and not based on personal knowledge" and "does not

mention the attorneys' fees for which it seeks indemnification as Parent Losses, which most

probably provided SCC and Dragados with tax benefits if deducted from tax returns as business

expenses." [Don. Reply Br. at 15.]

Section 10.7(b) provides:

> Any party receiving a payment pursuant to Section 10.1 or 10.2 shall reimburse the indemnifying party for the amount of any tax benefit *actually realized by the indemnified party* as a result of the Parent Loss or Shareholder Loss, as applicable, in respect of which such payment is made. For this purpose, the indemnified party shall be considered to have actually realized a tax benefit only when, after utilizing all deductions, losses and credits otherwise available to it, there has been a decrease in the cumulative Taxes payable by such indemnified party as a result of such Parent Loss or Shareholder Loss, as applicable, irrespective of whether such decrease occurs in the taxable year in which the Parent Loss or Shareholder Loss, as applicable, occurs. Payments by an indemnified party pursuant to Section 10.1 or 10.2 shall be made within fifteen (15) days from the date of filing the Tax Return on which the related tax benefit is actually realized. If at any time subsequent to such payment such tax benefit is reduced or increased on account of an audit adjustment or for any other reason, the indemnified party shall so notify the indemnifying party and the indemnifying party shall repay to the indemnified party within fifteen (15) days of receipt of such notice the amount of such reduction together with interest thereon from the date payment was first made to the indemnifying party at a rate equal to the rate described in Section 2.2 hereof.

16

SPA § 10.7(b) (emphasis added). The Court does not read this subsection to impose an affirmative obligation on Dragados to come forward with evidence showing that it did not receive tax benefits as a result of its parent losses, as Donovan suggests. Significantly, Donovan offered no evidence on this issue at trial, and did not object to the admissibility of—or rebut— the testimony of Dragados's President that there were no tax benefits. Consequently, the Court is satisfied, based on the unrebutted testimony of Dragados's President that there was neither "clear error" warranting relief under Rule 52(b), nor a "clerical mistake" warranting relief under Rule 60(a). [Tr. Day 4, Lopez 163-164.] The Court will not expand the scope of Judge Keefe's fact-finding.

## IV.    Conclusion

Based on the foregoing, the judgment is amended to reflect the Court's finding that Donovan is liable for: $1.185 million ($22.37 million - $20 million = $2.37 million ÷ 2) **plus** one-half of the attorneys' fees and costs related to the government investigation **plus** all of the attorneys' fees and costs incurred in proceeding to trial **minus** his portion of the pre-closing tax credits ($442,346) plus interest.

An appropriate order will be entered.


**DATE**: September 10, 2013                                /s/ Katharine S. Hayden_____
                                                           Katharine S. Hayden, U.S.D.J.