UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

RAYMOND J. DONOVAN,

        *Plaintiff*,

  v.

DRAGADOS, S.A.; DRAGADOS
INVERSIONES USA, S.L.; and NEWARK
REAL ESTATE HOLDINGS, INC.,

        *Defendants*.

Civil No.: 09-409 (KSH) (CLW)

**OPINION AND ORDER**

**THIS MATTER** comes before the Court by way of a motion pursuant to *Federal Rule of Civil Procedure* 54(b) (D.E. 327) by plaintiff Raymond Donovan to vacate part of the damage award in the Court's June 28, 2013 opinion (D.E. 249 (the "2013 Opinion")). Following a bench trial that took place over five days in January and February of 2013, the Court found that Donovan breached the Stock Purchase Agreement ("SPA") that effected the sale of Schiavone Construction Company ("SCC") from Donovan and his business partner Ronald Schiavone to a Spanish construction conglomerate made up of defendants Dragados, S.A., Dragados Inversiones USA, S.L., and Newark Real Estate Holdings, Inc. (collectively "Dragados"). (*Id.* at 34, 39.) The Court determined that the fees and costs incurred by Dragados in negotiating and settling with the government were the natural and probable consequences of Donovan's misrepresentations and awarded Dragados money in the amount of the penalties SCC paid to the

government, $22,370,000.[1] (*Id.* at 34, 39, 46-47.) Accounting for a $10,000,000 offset because Dragados had not paid Donovan the final portion of the purchase price, and dividing the amount in half in accord with the several liability provided for in the SPA, that $22,370,000 was reduced to $6,185,000. (*Id.* at 47.) Though not specifying the final amount, the Court noted that the award should be further reduced by Donovan's portion of the pre-closing tax refunds withheld by Dragados—$442,346 plus interest. (*Id.*)

Donovan asserts that the Court must reevaluate the award under a newly-decided Third Circuit case: *U.S. v. Nagle*, 803 F.3d 167 (3d Cir. 2015).[2] He argues that *Nagle* stands for the proposition that the government's loss in a disadvantaged business enterprise ("DBE") fraud case should not be based on the value of the contract but should include an offset for the fair market value of the labor, materials and services received by the government. Donovan posits that the award in this case is erroneous because the Court determined that it was reasonable given the value of the DBE contracts for those projects, without any consideration of offsets or credits for benefits the government received as a result of SCC completing performance of the contracts for Jobs 506, 510, and 511.[3] Donovan argues that the settlement did not release SCC from any civil claims and that an indictment would not preclude the company from procuring new business. At bottom, this amounts to a claim that SCC overvalued the government's DBE fraud case when it paid $22,370,000 to settle the claim.

---

[1] The Court also awarded legal and professional fees incurred in defending and negotiating a settlement to the criminal charges and in litigating the present lawsuit and appointed a Special Master to determine the appropriate amounts. (2013 Opinion at 47.) These amounts were the subject of other motion practice that has already been resolved by the Court. (D.E. 289, 292, 315, 320, 330, 333.)
[2] Oddly, Donovan's motion papers argue both that *Nagle* announces a new, intervening standard under which the Court must reevaluate its award (D.E. 327 at 1, 9) and that *Nagle* did not change the law—and should therefore be applied to a settlement agreement that occurred five years earlier (D.E. 334 at 13).
[3] Each of these jobs is discussed in detail in the 2013 Opinion; the Court writes for the parties and omits this history, with which Donovan and Dragados are very familiar.

Dragados counters that *Nagle* is inapposite because it addressed how to calculate "loss" for purposes of determining the offense level under the Federal Sentencing Guidelines. *Nagle* did not discuss other forms of monetary damages and penalties that may be assessed in a proceeding regarding DBE fraud, such as the other criminal claims the government threatened against SCC here. Along these lines, Dragados argues that the Court's finding that the settlement was reasonable took into consideration the possibility that an indictment would put SCC out of business because, as a practical matter, it would preclude bidding on any public projects. Finally, Dragados asserts that even if *Nagle* were applicable, it has no bearing on the reasonableness of a settlement that occurred five years before it was decided.

Donovan's argument is based on the standard set forth in *Nagle*, a criminal prosecution against two co-owners of construction businesses, Joseph Nagle and Ernest Fink. 803 F.3d at 171. Their businesses, neither of which was a certified DBE, made an arrangement with Marikina, a DBE company. The scheme was that in exchange for a fee, Marikina would bid for subcontracts but Nagle and Fink's businesses would do the work. *Id.* at 171-72. Overall, the participants secured contracts worth nearly $54 million under DBE programs. *Id.* at 172. Fink pled guilty to conspiracy to defraud the government and Nagle went to trial and was convicted on multiple charges. *Id.* at 171.

Meanwhile, as part of its sentencing determination for other cooperating defendants involved in the scheme, the trial judge issued an opinion on how to calculate the amount of loss for offenses involving fraud.[4] *See* United States Sentencing Commission, *Guidelines Manual*, § 2B1.1 (Nov. 2015). The trial judge concluded that the amount of loss was the face value of the

---

[4] "Subsection (a) [of USSG § 2B1.1] provides the base offense level . . . . Subsection (b) provides an extensive list of adjustments for offense-specific characteristics. . . . As the loss increases, the offense level increases[.]" *Id.* at 179.

3

contracts received and that the other defendants were not entitled to a credit for work performed because they had not refunded the contract price. *Nagle*, 803 F.3d at 174. The loss amount is a component of the specific offense characteristics and can increase the base offense level at which a defendant will be sentenced; consequently the presentence report suggested a 26-level increase for Fink and a 24-level increase for Nagle using the trial court's sentencing methodology (i.e. no credits for work performed). As a result, the defendants faced guidelines ranges of 168 to 210 months and 292 to 365 months respectively. 803 F.3d at 174; USSG § 2B1.1(b)(1).

After reviewing the application notes to the Sentencing Guidelines in detail, the Third Circuit determined that a "District Court should calculate the amount of loss under § 2B1.1 by taking the face value of the contracts and subtracting the fair market value of the services rendered under those contracts," and vacated Nagle's and Fink's sentences. *Nagle*, 803 F.3d at 179-80, 183. The Court followed Application Note 3(e)(i), which states that "'the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected shall be credited against the loss.'" *Id.* at 181-82.

That noted, *Nagle* does not warrant vacating this Court's damages award in the 2013 Opinion. *Nagle* stands in a starkly different context from the case at bar. The analysis in *Nagle* guides sentencing judges in fashioning loss amounts, a critical exercise given their profound impact on sentencing exposure. Here we have a civil proceeding that awarded damages following a breach of contract under that document's indemnity provisions. Thus, there will necessarily be limited cross-over in the reasoning and analysis applicable to the two cases.

But even looking beyond that, *Nagle* did not touch upon the myriad of factors that this Court evaluated in reaching its determination that the settlement SCC made with the government

4

was reasonable. Specifically, this Court found that "Dragados has marshaled convincing proofs about the strength of the government's case, the effect of that case going forward, and the basis for the financial calculations to support fully the reasonableness of the settlement reached between SCC and the authorities." (2013 Opinion at 45.) This evidence goes beyond simply transplanting the amount of the contracts awarded into the settlement agreement and then into the Court's damages award. Rather, it includes facts adduced at trial that include "the broad scope of the 2008 Search Warrants and Subpoenas executed at two SCC sites by agents from at least five different government agencies"; "representations made by the U.S. Attorney's Office regarding its strong evidence"; and "the adverse effect an indictment would have on Dragados-related entities doing business in the United States." (*Id.* at 44-45.) The Court is fully satisfied that the settlement SCC reached with the government was reasonable in light of the evidence produced at trial and upholds the damage award in the 2013 Opinion.

Upon consideration of the parties' submissions, and for the reasons set forth above,

**IT IS** on this 30th day of March, 2016, hereby

**ORDERED** that Donovan's motion to vacate in part the damage award in the 2013 Opinion is DENIED; and it is further

**ORDERED** that the clerk of the Court is directed to close this case.

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.